UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DEONTAY WILDER and
DIBELLA ENTERTAINMENT, INC.,

                Plaintiffs,

- against -

WORLD OF BOXING LLC and
ALEXANDER POVETKIN,

                Defendants.

CASE NO. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiffs Deontay Wilder ("Wilder") and DiBella Entertainment, Inc. ("DBE") (Wilder and DBE are collectively referred to herein as the "Plaintiffs"), by and through their counsel, Judd Burstein, P.C., as and for their Complaint against Defendants World Of Boxing LLC ("WOB") and Alexander Povetkin ("Povetkin") (WOB and Povetkin are collectively referred to herein as the "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.  Three years ago, Russian real estate tycoon Andrey Ryabinskiy ("Ryabinskiy") took up the promotion of professional prize fights as a hobby. This case concerns Ryabinskiy's biggest misadventure in boxing to date, his foiled attempt to acquire for his star protégé, the Russian boxer Alexander Povetkin, one of the crown jewels of the sport -- the World Boxing Council ("WBC") Heavyweight Championship of the World.[1] Ryabinskiy's attempt to secure the WBC Heavyweight title for Povetkin went up in smoke when -- a mere 8 days before Povetkin was

---

[1] The term "World Heavyweight Champion" in the sport of professional boxing is uniquely counter-intuitive because there can be as many as four different boxers viewed by the fans and the industry as World Heavyweight Champions. This is so because championships are awarded to bout victors by private "sanctioning organizations," each of which has its own rules and can recognize its own "World Heavyweight Champion." There are four major sanctioning organizations whose titles are accepted by the boxing industry and fan base as legitimate, and of economic and historic value: the WBC, the World Boxing Association, the International Boxing Federation, and the World Boxing Organization.

contractually bound, and WOB was contractually obligated to cause him to fight Wilder in a WBC Championship bout -- Povetkin tested positive for a dangerous performance-enhancing drug, the banned substance Meldonium. (Notably, the week before this Complaint was filed, Maria Sharapova ("Sharapova") was banned from professional tennis for two years by the International Tennis Federation ("ITF") after she tested positive for Meldonium).

2. As a consequence of Povetkin's positive test for Meldonium, and consistent with the ITF's decision regarding Sharapova, the WBC ruled that the bout with Wilder could not take place. In light of the WBC's ruling, Ryabinskiy's company, WOB, failed to deliver Povetkin's services for the fight and thereby breached its contract with Plaintiffs. Plaintiffs now sue for breach of contract and a judicial declaration that they are entitled to the release of Wilder's purse from escrow as a consequence of Defendants' breach.

3. Ironically, Ryabinskiy and WOB recently secured a judgment for some $2 million in damages against Don King (the "WOB/King Case") because his fighter, Guillermo Jones ("Jones"), could not participate in a World Boxing Association ("WBA") championship bout against a fighter promoted by WOB because Jones had ingested a banned substance, furosemide. *See World of Boxing LLC v. King*, 56 F. Supp. 3d 507 (S.D.N.Y. 2014) (Scheindlin, D.J.). There, Judge Scheindlin held:

> Under WBA rules -- which the Agreement incorporates by reference -- any boxer who tests positive for a banned, performance-enhancing substance is disqualified from WBA-sponsored bouts for no less than six months.[] Both parties agree that Jones ingested furosemide,[] and there is no question that having tested positive for furosemide, Jones could not participate in the bout[] This ends the inquiry. If Jones could not participate in the bout, it follows a *fortiori* that King could not have *caused* Jones to participate in the bout. Therefore, King breached the Agreement.

*Id.* at 512 (footnotes omitted) (italic emphasis in original).

2

4. Here too, the parties' contract incorporated the WBC's rules by reference and obligated WOB to produce Povetkin for the title fight, which WOB failed to do. Therefore, the rationale for Judge Scheindlin's ruling in the WOB/King Case applies with equal force here, and Defendants are liable for breach of contract, which entitles Plaintiffs to, *inter alia*, release of the escrow monies.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) in that (a) both Plaintiffs are citizens of the United States of America, and both Defendants are citizens of the Russian Federation, and (b) the amount in controversy, exclusive of interest and costs, exceeds $75,000.

6. This Court has personal jurisdiction over Defendants because, *inter alia*, pursuant to the two written agreements at issue in this case, the Defendants have explicitly submitted themselves to the jurisdiction of this Court.

7. Venue lies in this District pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to this cause of action arose in this District. Venue is further appropriate in this District because both agreements at issue here have a forum selection clause requiring any dispute between the parties to be litigated in this District.

## PARTIES

8. Plaintiff Wilder is citizen of the State of Alabama. He is an American professional boxer and is presently the WBC World Heavyweight Champion. In 2015, Wilder won the WBC

3

World Heavyweight Championship, finally ending an 8-year drought during which no American was heavyweight champion of the world.

9. Plaintiff DBE is a New York corporation with its principal place of business in Nassau County, New York. DBE is one of the leading boxing promotion companies in the United States.

10. Defendant Povetkin is a citizen of the Russian Federation. He is a former WBA World Heavyweight Champion, and a 2004 Olympic gold medalist.

11. Defendant WOB is a limited liability company organized under the laws of the Russian Federation that is owned by Ryabinskiy -- also a citizen of the Russian Federation. WOB is a boxing promotion company that has been in existence since on or about 2014.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**A. Background to the Scheduling of the Wilder vs. Povetkin WBC World Heavyweight Championship**

12. On January 17, 2015, Wilder defeated Bermane Stiverne to become the new WBC World Heavyweight Champion. As part of the WBC's Rules, a champion is obligated (subject to certain exceptions) to fight a "mandatory challenger" once a year.

13. On January 20, 2016, the WBC ordered Wilder and Povetkin (who had been designated as the "mandatory challenger" by the WBC) to begin negotiations for Wilder's mandatory defense. Pursuant to the WBC's rules, if the two sides were not able to reach an agreement on the terms of the fight, there would be what is known as a "purse bid." A purse bid is, essentially, a silent auction where any promoter registered with the WBC may submit a sealed bid for the right to promote a fight. The bid, submitted by a promoter in the form of a purse bid, is

4

the amount that the promoter is willing to pay for the services of the two fighters -- with the champion receiving 70% of that amount, and the challenger receiving 30%.

14. Because the parties did not reach an agreement on the terms of a Wilder-Povetkin bout, the WBC ordered a purse bid to take place on February 26, 2016. On that date, WOB won the purse bid with a bid of $7.15 million. Pursuant to WBC "purse bid" rules, absent extraordinary circumstances which were not present here, 10% of the amount bid (here $715,000) is paid as a bonus to the winner of the bout and the remaining 90% balance of the amount bid is split, with the champion (Wilder) receiving 70% as his purse for the bout and the challenger (Povetkin) receiving 30%. However, the boxers and their promoters must still enter into negotiations (and ultimately a bout agreement) with the winner of the purse bid concerning the other customary aspects of a bout agreement for a championship fight.

15. WOB scheduled the Wilder vs. Povetkin bout to take place in Moscow, Russia, on May 21, 2016 (the "Bout").

B. **The Parties' Initial Negotiations Regarding a Bout Agreement**

16. In early March 2016, WOB sent a proposed bout agreement to Wilder and DBE that was entirely inadequate. Of particular relevance here, WOB's draft agreement (i) required DBE to make Wilder's services available for the Bout, but there was no reciprocal obligation for WOB to make Povetkin's services available for the Bout, (ii) required no security for the payment of Wilder's multi-million dollar purse, which was inconsistent with the custom and practice in the boxing industry, and (iii) in terms of anti-doping drug testing for banned substances, it specified that

5

Wilder's blood and urine samples were to be tested at the Laboratoire Suisse d'Analyse du Dopage in Switzerland, while it was silent as to where Povetkin's samples would be tested.

17.     The WOB draft also contained a provision that if Wilder tested positive, DBE had to pay a fine to WOB equal to 100% of Wilder's purse, but there was no reciprocal provision for WOB if Povetkin tested positive.  By way of contrast, the Wilder/DBE team wanted both fighters to submit to the WBC Clean Boxing Program, which provides for random pre- and post-bout drug testing administered by the highly respected Voluntary Anti-Doping Association ("VADA").

18.     From late March through early April 2016, the parties and their agents exchanged a series of draft bout agreements, emails, and engaged in oral communications about the proposed terms of the bout agreement.  The communications and drafts emanating from Plaintiffs and their agents repeatedly made clear that Wilder and DBE were insisting upon, among other things, (i) appropriate security for Wilder's multi-million purse, (ii) provisions imposing upon WOB contractual obligations to promote the Bout and to provide Povetkin's services for the Bout, and (iii) a provision requiring that both fighters be subject to the WBC Clean Boxing Program.  The parties were unable to reach agreement on these issues.

19.     Plaintiffs' concerns about ensuring proper testing for banned substances became amplified when, in or around late March 2016, DBE received information that made it concerned that Povetkin was undergoing some kind of doping (*i.e.*, use of banned substances) regimen.  In particular, DBE learned that Povetkin had traveled to Spain, which was highly suspicious considering that (i) it is common knowledge in the boxing industry that Povetkin does not like to train outside of Russia, and (ii) while Spain is not known to be a traditional place for boxers to train,

6

it is notorious as an epicenter of doping. Based upon this information, DBE and Wilder began pressuring the WBC to immediately commence random doping testing for the Bout.

20. On March 28, 2016, Alberto Leon ("Leon"), counsel for the WBC, wrote an email to WOB and DBE that "contains the WBC's official and final ruling on the impasse your two companies have apparently reached concerning the finalization of the contract for the referenced bout." The WBC ruled that WOB had to provide security for Wilder's purse and that "[a]ll aspects of the Bout's anti-doping testing, management and reporting shall take place under the WBC Clean Boxing Program." It further gave the parties until March 30, 2016 to finalize the agreement.

21. Around this time, WOB engaged Kent Yalowitz, Esq. ("Yalowitz"), of the law firm Arnold & Porter LLP, as counsel to represent it in finalizing the agreement.

22. The negotiations between the parties then proceeded primarily between Yalowitz, John Wirt, Esq. ("Wirt"), counsel for Wilder, as well as Lou DiBella ("DiBella") and Alex Dombroff ("Dombroff") of DBE, who exchanged marked up draft agreements, as well as email and verbal communications, but still could not reach a final agreement. Nonetheless, Plaintiffs' communications and drafts made clear that they were continuing to insist upon (i) appropriate security for Wilder's multi-million dollar purse, (ii) provisions imposing upon WOB contractual obligations to promote the Bout and to provide Povetkin's services for the Bout, and (iii) a provision requiring that both fighters be subject to the WBC Clean Boxing Program.

23. As discussed above, Wilder's camp had become suspicious that Povetkin's refusal to enter into an appropriate bout agreement that contained, among other things, VADA testing, was due

to the fact that Povetkin was intent on doping prior to the fight. When Wirt raised these concerns directly with Yalowitz, he assured Wirt that this was not the case, but instead stated that WOB did not want to expose itself to the same risks as Don King in the WOB/King Case, *i.e.*, having a multi-million dollar judgment entered against it because it was unable to produce a fighter's services for the fight due to a failed drug test. As it turned out, the WBC ultimately required WOB to enter into an agreement that imposed upon WOB the very risk Yalowitz had told Wirt that WOB wanted to avoid.

C. **The WBC's Involvement Resulting in a Signed Bout Agreement**

24. On April 6, 2016, WBC President Mauricio Sulaiman ("Sulaiman") advised the parties in an e-mail that because they could not come to terms for the fight, the WBC would draft an agreement with input from both sides. Sulaiman's April 6, 2016 email specifically stated that

> This letter confirms the following topics which are **final and cannot be disputed**:
>
> - **The WBC rules and regulations will govern this event in its entirety**. Any decision, result and action will be exclusively performed by the WBC.
>
> - The WBC Clean Boxing Program will be the exclusive system for antidoping testing in both out of competition random testing and after the fight testing. The CBP is performed by independent agency VADA and all procedures and protocols are absolutely done by VADA and its administration. **No party, including the WBC may interfere or dictate any of VADA's course of action which includes collection, chain of custody, laboratory, reports, etc.... The personnel, the materials, the process, the vendors and institutions that perform this program are exclusively determined and administered by VADA.**

(Emphasis supplied).

8

25. Later that same day, Robert Lenhardt ("Lenhardt"), Secretary General of the WBC, and also an attorney, wrote WOB and DBE advising that while the WBC had the authority to determine whether the form of the agreement presented by WOB was acceptable, he had instead been tasked by Sulaiman with preparing "a final document to be signed by both promoters." In other words, by not adopting WOB's proposed agreement and instead drafting its own version, the WBC of necessity rejected WOB's draft. Lenhardt further confirmed that "the Clean Boxing Program is currently in effect and VADA may test either boxer at any time."

26. Over the course of the next several days, multiple iterations of the WBC contract were circulated, with the final version being sent on April 11, 2016. The final WBC version sided with Plaintiffs' insistence that WOB be contractually obligated to produce Povetkin for participation in the bout, just as DBE would have a corresponding obligation with respect to Wilder. The WBC also ruled in Plaintiffs' favor on the doping issue, requiring random pre-bout testing administered by VADA.

27. Thereafter, Plaintiffs and Defendants entered into a written WBC Championship Bout Agreement effective as of April 11, 2016, a copy of which is attached hereto as Exhibit A (the "WBC Agreement"). In the WBC Agreement, WOB covenanted, *inter alia*, that (i) it was Povetkin's promoter and would make his services available for the Bout, (ii) it would promote the Bout on May 21, 2016, (iii) the WBC's Rules & Regulations were incorporated by reference, (iv) the combined purses of the fighters was $7,150,000, out of which the victor would receive 10% as a bonus for winning,[2] (v) no less than 21 days prior to the Bout, WOB would place Wilder's

---

[2] To be clear, the 10% bonus (or $715,000) was deducted from the $7,150,000 purse bid amount, leaving a balance of $6,435,000 to be split (subject to sanctioning fees) with 70% going to Wilder as his purse and 30% to

9

$4,369,365 purse in escrow, and (vi) "[t]he WBC Clean Boxing Program ("CBP") shall be the exclusive program governing all aspects of anti-doping testing in both out-of-competition random testing and testing immediately after the Bout."

**D.     Defendants' Stall Tactics in Relation to Drug Testing**

28.     As alleged *supra*, WOB originally sent an agreement to DBE on March 4, 2016 that called for non-VADA testing in Switzerland.

29.     Agents of Wilder and Povetkin received an official letter from Lenhardt on March 10, 2016 stating that the WBC Clean Boxing Program would be in place for the Bout, meaning that both Wilder and Povetkin were required to submit to testing run by VADA.

30.     Nonetheless, in an article posted in the early hours of March 14, 2016 on BoxingScene.com, Ryabinskiy was quoted as saying that he did not consent to VADA testing, and instead wanted all testing of the samples done in Europe.

31.     On March 14, 2016, Dr. Margaret Goodman of VADA provided DBE with the forms necessary to enroll Wilder in the VADA program. Upon information and belief that is based in part upon the fact that Wilder was scheduled to fight Povetkin as well as the WBC's customs and practice, this information was sent to WOB for Povetkin at the same time.

32.     On the morning of March 25, 2016, Wilder submitted his VADA registration forms. On that same day, Leon sent an email to DBE's in-house counsel, Dombroff, with copies to WOB employees, acknowledging that Wilder had submitted his VADA paperwork. Dombroff replied to

---

Povetkin as his purse pursuant to the WBC's rules. In other words, WOB was not required to pay an additional 10% bonus on top of the $7,150,000 in purses that it had committed to pay pursuant to the purse bid. The WBC is presently holding in escrow the $693,350 bonus ($715,000 net of the WBC's 3% sanction fee) and has not issued a formal ruling as to what is to be done with the escrowed monies. Hence, those monies are not presently at issue in this litigation.

Leon's email, stating that even without a signed contract with WOB, "it is very important to Deontay Wilder's camp that drug testing begin on this bout as soon as possible."

33. Also on March 25, 2016, Ryabinskiy was again quoted, this time on FightNews.com, regarding drug testing: "The only thing - who, how, where and when will be collecting these tests, at this time - that is a matter of negotiations." Ryabinskiy's statements flew in the face of the WBC's Clean Boxing Program mandated by the WBC for the Bout because one of the main purposes of the program is to eliminate negotiations on the logistics of testing and promoters' control over such testing.

34. On March 28, 2016, 18 days after Lenhardt's letter and three days after Wilder had already enrolled in testing and asked for it to begin, Yalowitz called Wirt asking if Wilder would consent to a program other than VADA, which would include testing in Swiss labs. Wirt rejected this request.

35. On March 28 and March 30, 2016 Leon sent emails to the principals of DBE and WOB, and their respective legal representatives, stating yet again that the WBC Clean Boxing Prpgram administered by VADA would govern drug testing. In the March 30, 2016 email, Leon was clear that logistics of drug testing were not a matter of negotiation: "[a]ll aspects of the Bout's anti-doping testing, management and reporting shall take place under the WBC Clean Boxing Program."

36. On April 1, 2016, Povetkin submitted his forms to VADA, but this was entirely illusory considering that his camp continued to protest VADA's authority under the WBC Clean Boxing Program.

11

37. On April 3, 2016, Yalowitz emailed Wirt stating "[w]ith regard to anti-doping, we agree that the WBC's Clean Boxing Program shall govern. Because of the recent scandal in Russia involving anti-doping issues, it's very important to our side that the anti-doping collection, transportation, and testing be conducted by nationals who are not from the U.S. or Russia." This email was inconsistent with the purpose of the WBC Clean Boxing Program and using VADA -- specifically, so that no party can have say over collection, transportation, and testing. Thus, WOB again rejected VADA under the guise of consent -- a tactic which Wirt rejected.

38. WOB managed to further stall drug testing by failing to pay VADA. Indeed, as confirmed in an April 6, 2016 email from DiBella to, *inter alia*, the WBC, VADA only registered Wilder and Povetkin for testing because the WBC -- not WOB -- took the extraordinary step of guaranteeing that VADA would be paid. Based upon the normal customs and practice of professional boxing, the principal promoter of a bout, here WOB, arranges for payment and initiation of drug testing. It was highly unusual that the WBC had to take it upon itself to guarantee VADA's payment in order for the testing to commence.

39. On April 6, 2016, Sulaiman sent a letter to the parties which stated in relevant part:

> The WBC Clean Boxing Program will be the exclusive system for antidoping testing in both out of competition random testing and after the fight testing. The CBP is performed by independent agency VADA and all procedures and protocols are absolutely done by VADA and its administration. No party, including the WBC may interfere or dictate any of VADA's course of action which includes collection, chain of custody, laboratory, reports, etc.... The personal, the materials, the process, the vendors and institutions that perform this program are exclusively determined and administered by VADA.

This was at least the fourth time the WBC found it necessary to reiterate this matter to WOB and its representatives.

40. Even after Sulaiman's April 6, 2016 letter, Yalowitz refused to give in, and instead sent Wirt an April 7, 2016 email, yet again trying to negotiate the logistics of testing, stating

> With regard to testing, we have been very clear that neutrality in the nationality of the collectors, transporters, and lab are absolutely essential to the integrity of the process and the fan-base's faith in the process. It would be a tragedy for anyone to pig-headedly insist on it being "my way or the highway" and in the process damage the public's faith in the neutrality of WBC's new clean-boxing program.

Wirt rejected Yalowitz's entreaties.

41. Upon information and belief that is based in part upon this abject stalling and general resistance to VADA's protocols, WOB was fully aware that Povetkin was intent upon using Meldonium, or some other doping agent, before his fight against Wilder, and was seeking less rigorous drug testing so that Povetkin's cheating would not be discovered.

E. **The Escrow Agreement**

42. On or about April 19, 2016, DBE, Wilder, WOB, and a non-party Escrow Agent (the "Escrow Agent") entered into an escrow agreement (the "Escrow Agreement")[3] dated April 19, 2016. The Escrow Agreement provided that WOB would deliver $4,369,365.00 to the Escrow Agent (the "Deposit") at least 21 calendar days before the Bout.

43. In accordance with the terms of the WBC Agreement and the Escrow Agreement, WOB delivered the Deposit to the Escrow Agent.

44. The Escrow Agreement contains a liquidated dmaages provision.

---

[3] The Escrow Agreement has a confidentiality provision. Hence Plaintiffs have not annexed it to the Complaint, and have, to the greatest extent possible, not revealed its terms.

F.     **Povetkin Tests Positive for Meldonium**

45.    VADA conducted random tests of both Wilder and Povetkin on April 7, 8 and 11, 2016.

46.    Povetkin's test results from VADA for April 7, 8, and 11, 2016, were all negative, including for Meldonium.

47.    More than two weeks later, on April 27, 2016, VADA conducted another random test of Povetkin.

48.    Povetkin's April 27, 2016 test came back positive for Meldonium.

49.    VADA has adopted an Official Prohibited List, which it publishes on its website, and which identifies those substances that may not be used at any time during a VADA testing period. Meldonium is on the Official Prohibited List.

50.    On information and belief that is based upon the fact that Povetkin's three negative tests (administered on April 7, 8, and 11, 2016), all of which preceded the positive test administered on April 27, 2016, Povetkin took the Meldonium after his April 11, 2016 test, gambling that he would not be randomly tested again after his third test back on April 11, 2016.

51.    On May 15, 2016, as a result of Povetkin's positive drug test, the WBC issued a ruling that the Bout would not take place on the contractually agreed upon date of May 21, 2016.

52.    Accordingly, as a result of Povetkin's positive test for a prohibited substance on VADA's Official Prohibited List, WOB failed to meet its obligations (i) to promote the Bout on the contractually agreed-upon date of May 21, 2016 between Wilder and Povetkin, and (ii) as Povetkin's promoter, to make Povetkin's services available to participate in the Bout.  Similarly, Povetkin failed to honor his obligation to participate in the Bout on May 21, 2016.

G.    **The Parties' Dispute Over the Escrowed Monies**

53.    On May 15, 2016, Wirt sent the Escrow Agent a letter informing it of Povetkin's positive drug test and that the Bout would not take place on the date of May 21, 2016 as contractually required. Wirt further requested that the Escrow Agent not disburse any of the Deposit until it received a joint instruction from the parties or a non-appealable order from a court of competent jurisdiction.

54.    On June 1, 2016, Yalowitz sent Wirt a letter making clear WOB's refusal to consent to release of the Deposit to Plaintiffs, instead threatening to sue Wilder for $2.5 million in liquidated damages if Wilder did not immediately agree to allow the Escrow Agent to return the Deposit to WOB.

55.    As of the date of this Complaint, WOB continues to assert that it is entitled to return of the Deposit.

**FIRST CLAIM FOR RELIEF**

**(BREACH OF WBC AGREEMENT AGAINST BOTH DEFENDANTS)**

56.    Plaintiffs repeat and reallege the allegations stated above as if fully and completely set forth herein.

57.    Plaintiffs and Defendants entered into the WBC Agreement, a valid and binding written contract that sets forth the terms and conditions governing the Bout.

58.    As detailed above, Defendants breached the WBC Agreement.

59.    Plaintiffs have been damaged as a result of those breaches and are entitled to damages in an amount to be determined at trial, but which are in no event less than $5 million.

## SECOND CLAIM FOR RELIEF

## (BREACH OF THE ESCROW AGREEMENT AGAINST WOB)

60. Plaintiffs repeat and reallege the allegations stated above as if fully and completely set forth herein.

61. By reason of the foregoing, WOB has breached the Escrow Agreement.

62. Plaintiffs have been damaged in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

## (DECLARATORY JUDGMENT)

63. Plaintiffs repeat and reallege the allegations stated above as if fully and completely set forth herein.

64. The purpose of the Escrow Agreement was "to secure the purse for the Bout."

65. After Povetkin tested positive, Wilder, through his attorney, requested that the Escrow Agent not return any of the monies to WOB.

66. In response, WOB, through Yalowitz, threatened Wilder that if he did not agree to the release of the monies to WOB, WOB would seek liquidated damages of $2.5 million from Wilder.

67. A justiciable controversy has therefore arisen as to whether it is Plaintiffs or WOB who are entitled to release of the Deposit.

68. Plaintiffs have no adequate remedy at law and the equities favor them.

69. Plaintiffs are therefore entitled to a judicial declaration that they are entitled to release of the Deposit.

16

**WHEREFORE**, Plaintiffs hereby demand Judgment against Defendants as follows:

(a) On the First Claim for relief, an award of damages in an amount to be determined at trial, but which are in no event less than $5 million;

(b) On the Second Claim for Relief, an award of damages in an amount to be determined at trial;

(c) On the Third Claim for Relief, a judicial declaration that Plaintiffs are entitled to release of the monies presently held in escrow;

(d) An award of the costs and disbursements of this action; and

(e) Such other and further relief that this Court may deem just and proper.

Dated: New York, New York
       June 13, 2016

> Yours, etc.,
>
> JUDD BURSTEIN, P.C.
> *Attorneys for Plaintiffs*
>
> By: _____
> Judd Burstein (JB 9585)
> Peter B. Schalk (PBS 8257)
> 5 Columbus Circle, Suite 1501
> New York, New York 10019
> Tel.: (212) 974-2400
> Fax: (212) 974-2944
> Email: jburstein@burlaw.com
>            pschalk@burlaw.com

17