UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
DEONTAY WILDER, et al.,                             :

                Plaintiffs,            :            <u>OPINION AND ORDER</u>

                           :            16 Civ. 4423 (ALC) (GWG)
             -v.-                        (Lead Case)

                           :

WORLD OF BOXING LLC, et al.,                        :

               Defendants.             :
---------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

     World of Boxing LLC, and Alexander Povetkin (collectively, "WOB") move in limine to

exclude at trial the testimony of John Wirt, an attorney for Deontay Wilder and DiBella

Entertainment, Inc. (collectively, "Wilder").[1]  For the reasons stated below, the motion is

granted.

I.    <u>BACKGROUND</u>

    A.    <u>The Bout Agreement and the Escrow Agreement</u>

    This case consists of two consolidated actions related to a championship boxing match

between Deontay Wilder and Alexander Povetkin that never took place.  <u>See</u> Complaint, filed

June 13, 2016 (Docket # 1 in 16 Civ. 4423); Amended Complaint and Demand for Jury Trial,

---

[1]  <u>See</u> Notice of Motion <u>In Limine</u> to Preclude Testimony of John Wirt, filed Nov. 21,
2016 (Docket # 54); Declaration of Tanya E. Kalivas in Support of Motion <u>In Limine</u> to
Preclude Testimony of John Wirt, filed Nov. 21, 2016 (Docket # 55) ("Kalivas Decl.");
Memorandum in Support of Motion <u>In Limine</u> to Preclude Testimony of John Wirt, filed Nov.
21, 2016 (Docket # 56) ("WOB Mem."); Declaration of Peter B. Schalk, filed Nov. 30, 2016
(Docket # 62) ("Schalk Decl."); Declaration of John Wirt in Opposition to Motion <u>In Limine</u>,
filed Nov. 30, 2016 (Docket # 63); Memorandum of Law in Opposition to Motion <u>In Limine</u>,
filed Nov. 30, 2016 (Docket # 64) ("Wilder Mem."); Reply Memorandum in Support of Motion
<u>In Limine</u> to Preclude Testimony of John Wirt, filed Dec. 12, 2016 (Docket # 79); Declaration of
Kent A. Yalowitz, filed Dec. 12, 2016 (Docket # 80).

<u>World of Boxing LLC et al. v. Wilder et al.</u>, filed Sept. 28, 2016 (Docket # 30 in 16 Civ. 4870) ("WOB Am. Compl.").

The boxing match arose as the result of a bidding process instituted by the World Boxing Council ("WBC").  WOB was the high bidder, which means that the WBC first allowed Wilder and WOB to attempt to negotiate an agreement regarding the holding of the bout.  <u>See</u> Complaint ¶ 14; WOB Am. Compl. ¶ 25.

The negotiations, conducted in relevant part principally by attorneys Kent Yalowitz and Tanya E. Kalivas for WOB, and by John Wirt for Wilder, did not result in an agreement.  Some of these negotiations are the subject of this motion and are discussed in more detail below.

Ultimately, the parties never agreed on a version of the "Bout Agreement" and the WBC itself supplied an agreement for the parties to sign.  Both parties signed that agreement on April 11, 2016.  <u>See</u> World Boxing Council Championship Bout Agreement (attached as Exhibit 1 to Kalivas Decl.) ("Bout Agreement").  The Bout Agreement provided that a title bout between the champion, Wilder, and the challenger, Povetkin, would be held on May 21, 2016, in Moscow, Russia.  <u>Id</u>. ¶ 1.  The Bout Agreement states that each side's promoter "will make available the services" of its boxer.  <u>Id</u>.  The Bout Agreement also provides that: "The WBC Rules & Regulations shall govern the event in its entirety and shall be binding on all Parties.  The WBC shall exclusively perform any and all decisions, results, and actions relating to the Bout."  <u>Id.</u> ¶ 3.  The Bout Agreement also required that each boxer be subjected to drug testing by an organization called "VADA" in accordance with the requirements of the WBC's "Clean Boxing Program."  <u>Id.</u> ¶ 7.

The Bout Agreement provided a purse of $7,150,000, 10% of which was to serve as a bonus to the winner (though part of it was paid to WBC).  <u>Id.</u> ¶ 4.  The Bout Agreement required

that WOB place 70% of the remaining money (less a fee to WBC) into escrow: that is

$4,369,365.  Id.  This money was identified as the "gross amount earned by the Champion" (i.e.

Wilder) without reference to the outcome of the bout.  Id.  The Bout Agreement stated that the

money was to be put into escrow and dictated certain terms of the expected escrow arrangement.

Id.  The Bout Agreement provided that the promoter was obligated to pay Povetkin $1,872,585,

less a fee to the WBC.  Id.

      Shortly thereafter, the parties began to negotiate the terms of an escrow agreement.

Again, the discussions between counsel regarding that agreement are discussed in more detail

below.  Wilder, DiBella Entertainment ("DBE"), WOB, and the trustee of the funds signed the

Escrow Agreement on April 19, 2016.  Escrow Agreement (attached as Exhibit 2 to Kalivas

Decl.), at 1, 11.  The Escrow Agreement required WOB to deposit $4,369,365, identified as the

"Escrow Property," into an escrow account.  Id. § 1.1.

      The Escrow Agreement appointed an escrow agent and required the escrow agent to pay

Wilder (consistent with the Bout Agreement) in the event the fight took place and Wilder

provided appropriate proof in the form of an affidavit and a copy of a news article showing that

the bout took place.  Id. § 1.3(a), (b).  The Escrow Agreement then provided as follows:

    Section 1.3    Disbursements

    (c)  Upon receipt by the Escrow Agent of an original affidavit signed by an
    officer of WOB, containing the signature and a seal of the notary public, stating
    that the Bout did not or will not take place on May 21, 2016 and a copy of an
    article from www.fightnews.com, reporting that the Bout between Wilder and
    Povetkin is cancelled or postponed and did not or will not take place on May 21,
    2016, Escrow Agent shall disburse the entire Escrow Property to WOB.

Id. § 1.3(c).  In other words, the escrow agent is required to disburse the "entire Escrow

Property" (that is, the $4,369,365) to WOB under the terms of this paragraph.

In its next section, the Escrow Agreement provides that if, after submitting a disbursement request, either party objects to disbursement of the escrow property in writing within two days, then the escrow agent will not disburse the funds until it receives joint instruction from the parties or a court order.  The pertinent language is as follows:

> (d)      . . . Escrow Agent shall notify each of WOB, DBE and Wilder via e-mail in accordance with Section 10 below upon its receipt . . . of each disbursement request.  Escrow Agent shall not disburse any funds until 2 days after providing such notification.  If during the 2 days following such notification either Party objects in writing to the disbursement of the Escrow Property, the Escrow Agent shall not disburse any funds unless and until it receives joint instruction from the parties or a non-appealable order from a court of competent jurisdiction, at which time it shall disburse the funds to the parties as their interests may appear; . . . . The parties agree and acknowledge that the submission of an objection in writing to the Escrow Agent which is not made in good faith would cause harm to the party entitled to the disbursement and because actual damages would be difficult to quantify, the party who has filed such objection agrees to pay liquidated damages to the party entitled to the disbursement in the amount of USD $2.5 million (two million five hundred thousand), not as a penalty but as a fair estimation of the loss suffered.

Id. § 1.3(d).

B.    Subsequent Events

The Bout Agreement required that Wilder report to Moscow, Russia, seven days before the Bout, which was May 14, 2016.  Bout Agreement ¶ 1.  On May 13, 2016, the WBC announced that a drug testing laboratory reported that Povetkin had a positive urine test for Meldonium, at a level of .07 micrograms/milliliter.  WOB Am. Compl. ¶¶ 2-3, 57.  The WBC had previously ruled that, as of January 1, 2016, Meldonium was a banned substance.  Id. ¶ 2. The parties disagree as to whether the positive urine test amounted to a violation of the WBC rules or a violation of the Bout Agreement.

On May 15, 2016, the WBC announced on Twitter that the Bout had been postponed while its investigation continued.  Id. ¶ 64.  Although WOB had not yet sought release of the

4

escrow funds, Wilder wrote to the escrow agent on May 15, 2016, invoking Section 1.3(d), to object to any release of the escrow property. See Letter from John S. Wirt, dated May 15, 2016 (annexed as Exhibit 3 to Schalk Decl.). The letter stated that the basis for the objection was that WOB had violated the Bout Agreement. Id. at 2. Wilder, who had been training in England for the fight, did not appear in Moscow and returned to the United States on May 16, 2016. Id. ¶¶ 63-66.

On August 17, 2016, the WBC announced that "[b]ased on the scientific and medical information the WBC received during its investigation and inquiry processes and on the WADA Notices, it is not possible to ascertain that Mr. Povetkin ingested Meldonium after January 1, 2016." WBC Ruling Regarding Alexander Povetkin, dated Aug. 17, 2016 (attached as Exhibit 5 to Kalivas Decl.), at 5, § IX. The WBC stated that "[i]n order to protect the welfare and health of the participants, the WBC called the Bout off and reserved any further ruling until the ongoing investigation, inquiry and evaluation process concluded." Id. at 5, § IX(a). On October 7, 2016, the WBC issued a follow-up ruling. See WBC Update Regarding the Status of the Heavyweight Division, dated Oct. 7, 2016 (attached as Exhibit 1 to Schalk Decl.). In it, WBC stated that "[f]or the avoidance of doubt, the WBC hereby states that the WBC [August 17] ruling was not intended to convey, and should not be construed as conveying, a conclusion about whether Mr. Povetkin did or did not take Meldonium after it became a banned substance on January 1, 2016." Id. at 2. The WBC stated that if it were found that Povetkin did take Meldonium at a time when it was a banned substance (that is, after January 1, 2016), he will lose his "mandatory" status and be suspended and fined. Id.

C.      The Claims in this Case

Wilder asserts three claims: breach of the Bout Agreement, breach of the Escrow Agreement, and a request for a declaratory judgment.  It appears that Wilder alleges that WOB breached the Bout agreement as a result of Povetkin's testing positive for Meldonium.  See Complaint ¶¶ 56-59.  Wilder also claims that WOB breached the Escrow Agreement, apparently by failing to instruct the escrow agent that Wilder be paid.  Id. ¶¶ 60-62.  Wilder requests a declaratory judgment instructing the escrow agent to release the funds to Wilder.  Id. ¶¶ 63-69.

WOB asserts four claims.  The first is a claim for breach of contract relating to the Bout Agreement.  It asserts that Wilder breached the Bout Agreement by not showing up in Moscow, thereby repudiating the contract and allegedly causing WBC to cancel the fight.  WOB Am. Compl. ¶¶ 83-92.  The second claim asserts that Wilder breached the Escrow Agreement by improperly instructing the escrow agent not to release the funds to WOB.  Id. ¶¶ 93-99.  It also asserts that Wilder did not act in "good faith" under the Escrow Agreement in blocking the release of the funds, thereby entitling WOB to the $2.5 million in liquidated damages specified in section 1.3(d) of the Escrow Agreement.  Id. ¶¶ 98-99.  The third claim is a claim for breach of the implied covenant of good faith and fair dealing inherent in the Bout Agreement.  Id. ¶¶ 100-103.  WOB asserts Wilder and his promoter breached this implied covenant "when they acted to pressure the WBC to cancel the Bout, to disqualify Povetkin from challenging the WBC title and when they requested a voluntary match which resulted in the injury to Wilder."  Id. ¶ 102.  The final claim is for defamation based on statements Wilder made to the press about Povetkin's conduct, including alleged use of banned substances.  Id. ¶¶ 104-109.

II.     DISCUSSION

WOB has moved in limine to prohibit the testimony of John Wirt, the attorney who

negotiated the agreements for Wilder.  "The purpose of an in limine motion is to aid the trial

process by enabling the Court to rule in advance of trial on the relevance of certain forecasted

evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption

of, the trial."  Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996) (citation and internal

quotation marks omitted).  The movant in a motion in limine seeking to exclude evidence "has

the burden of establishing that the evidence is not admissible for any purpose."  United States v.

Pugh, 162 F. Supp. 3d 97, 101 (E.D.N.Y. 2016) (quoting United States v. Goodale, 831 F. Supp.

2d 804, 808 (D. Vt. 2011)).  A court's decision on the admissibility of evidence on a motion in

limine may be "subject to change when the case unfolds . . . because the actual evidence changes

from that proffered by the movant."  United States v. Fiumano, 2016 WL 1629356, at *2

(S.D.N.Y. Apr. 25, 2016) (citing Luce v. United States, 469 U.S. 38, 41-42 (1984)).

Wilder's motion papers state that he seeks to offer Wirt's testimony on three topics:

(1) the meaning of the Escrow Agreement, Wilder Mem. at 15; (2) the meaning of the Bout

Agreement, id. at 17; and (3) the factual issue of whether "Povetkin intentionally ingested

Meldonium at a time when it was a banned substance," id. at 15.  We discuss each topic next.

A.      The Escrow Agreement

1.      Law on Extrinsic or "Parol" Evidence

Under New York law, which both parties agree applies in this case, "[e]xtrinsic evidence

of the parties' intent [as expressed in an agreement] may be considered only if the agreement is

ambiguous."  See Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 466

(2d Cir. 2010) (first alteration in original) (internal quotation marks omitted) (quoting Greenfield

7

v. Philles Records, Inc., 98 N.Y.2d 562, 569 (2002)).  "[W]here the parties have reduced their

agreement to an integrated writing, the parol evidence rule operates to exclude evidence of all

prior or contemporaneous negotiations between the parties offered to contradict or modify the

terms of their writing."  O'Grady v. BlueCrest Capital Mgmt. LLP, 111 F. Supp. 3d 494, 502

(S.D.N.Y. 2015) (alteration in original) (internal quotation marks omitted) (quoting Marine

Midland Bank-Southern v. Thurlow, 53 N.Y.2d 381, 387 (1981)), aff'd, 646 F. App'x 2 (2d Cir.

2016) (summary order).  Thus, the "threshold question in a dispute over the meaning of a

contract is whether the contract terms are ambiguous."  See Revson v. Cinque & Cinque, P.C.,

221 F.3d 59, 66 (2d Cir. 2000).  "The question of whether the language of a contract is clear or

ambiguous is a question of law to be decided by the court."  Compagnie Financiere de CIC et de

L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 158 (2d Cir.

2000) (citing Mellon Bank, N.A. v. United Bank Corp. of N.Y., 31 F.3d 113, 115 (2d Cir.

1994)).

      Where a contract is unambiguous, its meaning is similarly "a question of law for the

court to decide," Revson, 221 F.3d at 66 (citing K. Bell & Assocs. v. Lloyd's Underwriters, 97

F.3d 632, 637 (2d Cir. 1996)); see also Law Debenture, 595 F.3d at 465-68, and is determined

solely by reference to the "four corners of the agreement," Abundance Partners LP v. Quamtel,

Inc., 840 F. Supp. 2d 758, 767 (S.D.N.Y. 2012).  The meaning of an ambiguous agreement, by

contrast, is a question of fact to be determined by the factfinder in the event extrinsic evidence

exists of the parties' intentions.  Revson, 221 F.3d at 66 (citations omitted).

      A contract "is unambiguous when it has a definite and precise meaning and where there

is no reasonable basis for a difference of opinion."  Klos v. Lotnicze, 133 F.3d 164, 168 (2d Cir.

1997) (citing Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091,

1094 (2d Cir. 1993)).  An ambiguous term exists, however, where "reasonable minds may differ"

about its meaning, Seiden Assocs. v. ANC Holdings, Inc., 959 F.2d 425, 430 (2d Cir. 1992),

taking into account "the customs, practices, usages and terminology as generally understood in

the particular trade or business," Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp., 830

F.3d 152, 156-57 (2d Cir. 2016) (internal quotation marks omitted) (quoting Chesapeake Energy

Corp. v. Bank of N.Y. Mellon Tr. Co., 773 F.3d 110, 114 (2d Cir. 2014)).  "A contract is not

ambiguous simply because the parties have urged conflicting interpretations."  Reyes v.

Metromedia Software, Inc., 840 F. Supp. 2d 752, 755 (S.D.N.Y. 2012) (citing Sayers, 7 F.3d at

1095).

> 2.   Analysis

While Wilder is well aware of the case law regarding the admissibility of extrinsic

evidence of a contract's meaning, see Wilder Mem. at 14-15, Wilder never specifies in his brief

which term or terms of the Escrow Agreement are ambiguous such that extrinsic evidence

addressed to the meaning of the ambiguous terms would be permitted.  Instead, Wilder recounts

some of the negotiations between Wirt and Kalivas (and to a lesser extent Yalowitz) over the

escrow agreement during which, Wilder claims, WOB asserted that it did not want to give

Wilder any authority to block the return of escrowed funds if the fight did not take place.

Wilder Mem. at 7-8; Declaration of John Wirt in Support of Defendants' Motion to Disqualify

Kent Yalowitz, Esq. and Tanya Kalivas, Esq. As Trial Counsel in this Matter, and from

Deposing Mr. Wirt, dated Nov. 7, 2016 (attached as Exhibit 2 to Schalk Decl.) ("Wirt Decl."),

¶¶ 19-21.  Wirt also states that he "discussed the possibility . . . of the purse being held in escrow

pending a litigation on the merits in the event that the May 21 Fight did not go forward for any

reason, including a positive test by Povetkin."  Wirt Decl. ¶ 22.  He asserts that the language in

the agreement confirms the "parties' . . . understanding" that the Escrow Deposit could be held pending litigation over who is entitled to the purse.  Id. ¶ 23.

Wirt also recounts discussions regarding the liquidated damages clause.  According to Wirt, the liquidated damages clause in the Escrow Agreement applied only to "entirely frivolous" actions that would keep the purse in escrow.  See id. ¶¶ 23-24.  Wirt further avers that "it was plainly agreed and understood that the situation presented here would not constitute bad faith" under the Escrow Agreement.  Id. ¶ 25 (emphasis in original).

None of these representations as to negotiations, however, indicate that there is any ambiguous term in the Escrow Agreement.  While Wilder makes clear that the testimony he seeks to offer is only in relation to section 1.3(d) of the agreement, see Wilder Mem. at 15, he never argues that the provision is ambiguous.

Certainly, there is a dispute as to whether Wilder acted in "good faith" in instructing the escrow agent not to disburse the funds.  See Escrow Agreement § 1.3(d).  And the parties may end up with differing views as to how that term should be applied.  Such differing views, however, do not mean that the term "good faith" is itself ambiguous.  See, e.g., Reyes 840 F. Supp. 2d at 755 ("A contract is not ambiguous simply because the parties have urged conflicting interpretations.").  Indeed, "good faith" is a legal term that has a well understood meaning. Should the issue be presented to a jury, perhaps a party may wish to offer testimony at trial on the meaning of the term "good faith" in the legal profession as a matter of "custom and usage."[2]

---

[2]  As the Second Circuit has stated, evidence of "custom and usage"

is to be considered by the court where necessary to understand the context in which the parties have used terms that are specialized.  See, e.g., Fox Film Corp. v. Springer, 273 N.Y. 434, 8 N.E.2d 23 (1937).  When the parties have used contract terms which are "in common use in a business or art" and have "a

But "[p]roof of custom and usage does not mean proof of the parties' subjective intent, for [e]xtrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous," Law Debenture, 595 F.3d at 466 (second alteration in original) (internal quotation marks omitted).   The question of whether Wilder acted in good faith in making the objection to the escrow release could be answered by a ruling on the narrow question of whether a party could permissibly object under paragraph 1.3(d) based on a claim that the Bout Agreement had been breached.   But the answer to this question must be based on an analysis of the two contracts — an exercise that to date neither party has briefed and argued before the Court.[3]

Wilder selectively quotes from a Second Circuit case to argue that "when 'extrinsic evidence is considered for the purpose of interpretation, the parol evidence rule is inoperative.'" Wilder Mem. at 14 (emphasis in original) (quoting Garza v. Marine Transp. Lines, Inc., 861 F.2d 23, 27 (2d Cir. 1988)).   But Garza makes clear that the "interpretation" it was referring to occurs

--------

definite meaning understood by those who use them," but which "convey no meaning to [t]hose who are not initiated into the mysteries of the craft," the parties, in order to have the court construe their contracts, "must furnish [the court] with the dictionaries they have used." Id. at 436, 8 N.E.2d at 24.   In such circumstances, the court "must be informed of the meaning of the language as generally understood in that business, in the light of the customs and practices of the business." Id. at 437, 8 N.E.2d at 24.

Law Debenture, 595 F.3d at 466 (alterations in original).

[3] We are of course aware that Wilder has pointed to a conference before Judge Carter where the question arose of whether WOB was entitled to judgment on a matter related to section 1.3(d).   See Transcript of Proceedings before the Honorable Andrew L. Carter, Jr., filed Nov. 17, 2016 (Docket # 42), at 34-35.   But the nature of the proposed motion presented to Judge Carter is not clear from the record.   In any event, Judge Carter made no ruling at that time that the contract was ambiguous or non-ambiguous.   The mere fact that the parties disputed what section 1.3(d) permitted does not create an ambiguity.   See Seiden Assocs., 959 F.2d at 428 ("The language of a contract is not made ambiguous simply because the parties urge different interpretations.").

11

only when contractual obligations are "ambiguous" or "not clearly stated."  861 F.2d at 27.

Thus, while "interpretation" evidence is not barred by the parol evidence rule if an ambiguity is

shown, merely labeling evidence as being offered to "interpret" a contract does not relieve a

party from showing that the contract is ambiguous.

Additionally, Wilder makes substantive arguments regarding the implied covenant of

good faith and fair dealing, noting that such claims need not "be tied to a specific contractual

provision."  Wilder Mem. at 16 (citation omitted).  While we are not aware that Wilder has made

a claim for relief under this doctrine, the doctrine has nothing to do with whether the Escrow

Agreement contains an ambiguous term, and thus Wirt cannot offer testimony on the question.

For the foregoing reasons, Wirt's testimony about the Escrow Agreement and its

meaning is excluded from trial because Wilder has not identified any ambiguity in the

agreement.  We pause to note that nothing herein is intended to preclude Wirt from testifying

regarding advice he gave to Wilder regarding the invocation of this clause in the event Wilder

wishes to offer it to argue that his invocation of section 1.3(d) was in "good faith."  In the event

that Wilder intends to offer such "advice-of-counsel" evidence, however, he should so inform

WOB forthwith.[4]

---

[4]  This is not to say that testimony from Wirt would be <u>required</u> to show Wilder's good faith.  In the Court's view, the Escrow Agreement is clear in not limiting in any substantive manner Wilder's power to lodge an objection to a disbursement under section 1.3(d), and that the only potential liability arising from an objection occurs where WOB shows that the objection was not made in "good faith."  Under this view, all that needs to be decided to adjudicate WOB's claim under section 1.3(d) is whether the particular basis Wilder had for lodging the objection was in good faith or not.  An argument that Wilder acted in good faith could be made without testimony of counsel if it was reasonable (even if erroneous) to interpret the contract to allow Wilder to make an objection to disbursement based on his claim to payment under the Bout Agreement.  Such a motion would more appropriately be made in advance of trial, however, as it would appear to raise a question of law rather than a factual question.

B.     Negotiations Surrounding the Bout Agreement

According to Wirt, Yalowitz was concerned during negotiations over the Bout
Agreement about potential liability for WOB should Povetkin not appear at the fight with Wilder
because of a positive drug test.  Wirt Decl. ¶ 8.  Wirt claims that this concerned him because it
"raised the distinct possibility that Povetkin intended to use performance enhancing drugs."  Id.
¶ 9.  Wirt's logic was that "if Povetkin knew he was going to be clean, there would have been no
cause for concern on Mr. Yalowitz's part."  Id.  Wirt was also disconcerted by alleged attempts
by Yalowitz to weaken the drug testing requirements for Povetkin under the contract.  See id.
¶¶ 15-17.  According to Wirt, Yalowitz pushed to weaken the rules regarding testing for
Povetkin.  Id. ¶ 16.  This conduct was "very suspicious" to Wirt.  Id. ¶ 17.

While Wirt makes additional allegations regarding the negotiations over the Bout
Agreement, it is not necessary to recount them further because negotiations between Wilder and
WOB broke down and the parties petitioned the WBC to intervene and resolve their disputes
about what the contract should say.  Id. ¶¶ 12-13, 18.  Thus, the disputed contract language
negotiated between Wirt and the WOB attorneys was not ultimately incorporated in the Bout
Agreement.  Rather, the Bout Agreement was drafted by the WBC and presented to the parties
for signature.  See id. ¶¶ 7-8, 14, 18; see also Wilder Mem. at 5, 7.  Notably, Wirt himself makes
clear that what Wilder identifies as the "key" language of the Bout Agreement, Wilder Mem. at
17, "was actually selected by the WBC to resolve a dispute between the parties," Wirt Decl. ¶ 8.

The effort to introduce Wirt's testimony as to the Bout Agreement fails because,
assuming arguendo the Bout Agreement is ambiguous (which Wilder explicitly denies, see
Wilder Mem. at 18), Wilder provides no evidence that any drafter of the agreement was part of
any of the discussions that Wirt recounts.  More pointedly, Wilder has not shown how

discussions between counsel would allow a non-ambiguous meaning to be ascribed to any of the terms that were actually chosen by the WBC and agreed to by the parties. Thus, evidence regarding statements between Yalowitz and Wirt would not aid in the interpretation of any ambiguous term in the Bout Agreement.[5]

Wirt makes reference to materials that were provided to WBC by WOB and Wilder attorneys prior to WBC's drafting of the Bout Agreement's provisions. See, e.g., Wirt Decl. ¶¶ 8, 12; Letter from Alex Dombroff to Alberto A. León, Esq., dated April 4, 2016 (annexed as Exhibit E to Wirt Decl.). The question of whether such evidence is admissible, however, has not been raised in this motion. In the event the Court found the Bout Agreement was ambiguous, such evidence might well be admissible.[6]

C.   Testimony from Wirt on the Issue of whether Povetkin Intentionally Ingested Meldonium When It Was Banned

In a brief argument, Wilder notes that Wirt is prepared to testify that during the negotiations over the Bout Agreement "Yalowitz (a) insisted that the WOB Parties should have no obligation to promote the fight or produce Povetkin, (b) tried to weaken the VADA testing protocols, and (c) admitted to Wirt that he was trying to avoid a 'Don King Problem'" — referring to an unrelated bout where a boxer could not fight because he had tested positive for a banned substance. Wilder Mem. at 15. Wilder argues that what Yalowitz purportedly said

---

[5]  It is perhaps possible that statements between counsel regarding their positions on the Bout Agreement mirror contentions made by WOB and Wilder to the WBC. But even assuming arguendo that such statements might have probative value as to the meaning of any terms in the Escrow Agreement, the discussions between counsel would be cumulative of the material presented to the WBC and thus are properly excluded under Fed. R. Civ. P. 403.

[6]  Once again, it would appear that the issue of ambiguity would have to be decided prior to trial by the Court.

during negotiations as to the Bout Agreement "corroborat[ed] . . . that Povetkin intentionally

ingested" a banned substance because "Yalowitz was trying to minimize the likelihood of

Povetkin getting caught, as well as the risks to the WOB Parties if Povetkin should get caught."

Id.  Wilder argues that the jury could "reasonably infer" from Yalowitz's conduct that Povetkin

"intended to take performance enhancing drugs."  Id.; see also id. at 23 (arguing that testimony

on Yalowitz's alleged effort to obtain contractual provisions dictating how drug testing would

occur would allow a jury to "conclude that Yalowitz did so to make it easier for Povetkin to use

banned substances without being caught").

The Court rejects this argument.  It would require impermissible speculation for a jury to

infer that an attorney's efforts to negotiate a contract that purportedly might have made it easier

for a client to engage in a course of conduct means that the client actually engaged in that course

of conduct during the performance of the contract.

Not surprisingly, the only case cited by Wilder, see Wilder Mem. at 15, 23, in support of

this extraordinary argument, United States v. Margiotta, 662 F.2d 131 (2d Cir. 1981), does not

support it in the slightest.  Margiotta is apparently being cited for its dictum that "[s]tatements

made by an attorney concerning a matter within his employment may be admissible against the

party retaining the attorney."  662 F.2d at 142-43.  Putting aside the fact that Margiotta excluded

the statement at issue in that case, Margiotta said nothing concerning what inferential leaps could

be made to attribute an attorney's efforts in negotiating a contract to behavior by a client.  Here,

no reasonable inference may be drawn that Yalowitz's efforts regarding the drug testing

requirements means that it is "more . . . probable" that Povetkin ingested a banned substance.

Fed. R. Evid. 401.  To the extent that it might be said that Yalowitz's negotiation posture might

have some minuscule probative value, the admission of this evidence would be far outweighed

by the potential prejudicial effect and likelihood of misleading the jury, and thus would have to be excluded under Fed. R. Evid. 403.

III.   <u>CONCLUSION</u>

     The motion in limine (Docket # 54) to exclude the testimony of John Wirt on the topics described above is granted.

     SO ORDERED.

Dated: December 16, 2016
      New York, New York

                                    GABRIEL W. GORENSTEIN
                                  United States Magistrate Judge