UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
DEONTAY WILDER, et al.,                          :

        Plaintiffs,                          :    OPINION AND ORDER

                                                :    16 Civ. 4423 (ALC) (GWG)

        -v.-                                 :

WORLD OF BOXING LLC, et al.,                     :

        Defendants.                          :
-----------------------------------------------------------------X

GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE

     Defendants World of Boxing LLC ("WOB"), Alexander Povetkin, and Andrey Ryabinskiy (collectively, the "WOB Parties") seek an order compelling plaintiffs Deontay Wilder, DiBella Entertainment, Inc. ("DBE"), and Lou DiBella (collectively, the "Wilder Parties") to produce a series of emails dated May 25, 2016.[1] For the following reasons, the motion to compel is denied.

---

[1] Notice of Motion to Compel, filed Oct. 10, 2017 (Docket # 270); Declaration of Kent A. Yalowitz in Support of the World of Boxing Parties' Motion to Compel, filed Oct. 10, 2017 (Docket # 271) ("Yalowitz Decl."); Memorandum of Law in Support of the World of Boxing Parties' Motion to Compel, filed Oct. 10, 2017 (Docket # 272) ("Defs. Mem."); Declaration of Ali R. Jaffery, Esq., filed Oct. 31, 2017 (Docket # 277) ("Jaffery Decl."); Declaration of Lou DiBella, filed Oct. 31, 2017 (Docket # 278) ("DiBella Decl."); Declaration of Alex Dombroff, filed Oct. 31, 2017 (Docket # 279) ("Dombroff Decl."); Declaration of Jon Wirt, filed Oct. 31, 2017 (Docket # 280) ("Wirt Decl."); Declaration of Shelly Finkel, filed Oct. 31, 2017 (Docket # 281) ("Finkel Decl."); Memorandum of Law in Opposition to the WOB Parties' Motion to Compel, filed Oct. 31, 2017 (Docket # 282) ("Pls. Mem."); Reply Memorandum of Law in Support of the World of Boxing Parties' Motion to Compel, filed Nov. 14, 2017 (Docket # 289) ("Defs. Reply"); Reply Declaration of Kent A. Yalowitz in Support of the World of Boxing Parties' Motion to Compel, filed Nov. 14, 2017 (Docket # 290) ("Yalowitz Reply Decl."); Letter from Ali R. Jaffery, filed Nov. 16, 2017 (Docket # 291); Declaration of Ali R. Jaffery, Esq., filed Jan. 12, 2018 (Docket # 307) ("Jaffery 2d Decl.").

I. BACKGROUND

  A. Facts

This case consists of two consolidated actions related to a planned boxing match between Deontay Wilder and Alexander Povetkin that never took place. See Complaint, filed June 13, 2016 (Docket # 1 in 16 Civ. 4423) ("Compl."); Amended Complaint, World of Boxing LLC v. Wilder, filed Sept. 28, 2016 (Docket # 30 in 16 Civ. 4870).

The planned boxing match arose as the result of a bidding process instituted by the World Boxing Council ("WBC"). See Wilder v. World of Boxing LLC, 220 F. Supp. 3d 473, 476 (S.D.N.Y. 2016). WOB, which promotes fights for Povetkin, and DBE, which promotes fights for Wilder, bid for the promotional rights. DiBella Decl. ¶ 5. WOB was the high bidder. Wilder, 220 F. Supp. 3d at 476. Thereafter, WOB and Povetkin, represented by attorneys Kent Yalowitz and Tanya E. Kalivas, and Wilder, represented by attorney John Wirt, attempted to negotiate an agreement regarding the holding of the bout. Id. Although not promoting the fight, DBE remained involved in these negotiations on behalf of Wilder. See DiBella Decl. ¶ 9 ("DBE worked with Mr. Wilder's management to negotiate the best possible deal for Mr. Wilder."). After the parties failed to agree on terms, the WBC supplied a "Bout Agreement" for DBE, Povetkin, Wilder, and WOB to sign, see WBC Championship Bout Agreement, dated Apr. 11, 2016 (annexed as Ex. C to DiBella Decl.) ("Bout Agreement"), which provided for the purse and required that the purse and other funds be put in escrow. See Wilder, 220 F. Supp. 3d at 476. Under the Bout Agreement, the parties agreed to submit to drug testing in accordance with a WBC testing program. Id. The parties signed that agreement on April 11, 2016. See Bout Agreement at 1, 5. The fight was scheduled to take place on May 21, 2016. Id. at ¶ 1. Shortly afterwards, the parties began negotiating the terms of an escrow agreement, which DBE, Wilder,

WOB, and the escrow agent of the funds, The Chicago Trust Company, signed on April 19, 2016. See Escrow Agreement, dated Apr. 19, 2016 (annexed as Ex. D to DiBella Decl.), at 1, 11.

The Bout Agreement required that Wilder report to Moscow, Russia, seven days before the fight, which was May 14, 2016. Wilder, 220 F. Supp. 3d at 477. On May 13, 2016, the WBC announced that a drug testing laboratory reported that Povetkin had a positive urine test for Meldonium, at a level of .07 micrograms/milliliter. Id. The WBC had previously ruled that, as of January 1, 2016, Meldonium was a banned substance. Id. On May 15, 2016, the WBC announced that the fight had been postponed while an investigation into the positive test continued. Id.

The same day as the WBC announced that the fight would be postponed, John Wirt wrote to the escrow agent on behalf of Wilder to object to any release of the escrow funds on the ground that the WOB Parties had violated the Bout Agreement. See Letter from John S. Wirt to Jennifer Czerwinski, dated May 15, 2016 (annexed as Ex. E to DiBella Decl.) ("Wirt Letter"). The letter invoked Section 1.3(d) of the Escrow Agreement, which provided, in part, that

> [i]f . . . either Party objects in writing to the disbursement of the Escrow Property, the Escrow Agent shall not disburse any funds unless and until it receives joint instruction from the parties or a non-appealable order from a court of competent jurisdiction, at which time it shall disburse the funds to the parties as their interests may appear.

Escrow Agreement § 1.3(d). The letter stated that it was Wilder's position that "WOB and Mr. Povetkin have breached [the Bout Agreement] with DBE and Mr. Wilder as a result of [Povetkin's positive drug test] . . . ." Wirt Letter at 2. Wilder, who had been training in England for the fight, returned to the United States on May 16, 2016, having never appeared in Moscow. Wilder, 220 F. Supp. 3d at 477.

3

On June 1, 2016, Kent Yalowitz wrote a letter to Wirt on behalf of the WOB Parties, demanding that Wirt withdraw his objections to the disbursement of the funds held in escrow and asserting that WOB "will hold [Wilder] responsible for liquidated damages . . . as provided for in the Escrow Agreement" if the objections are not withdrawn. Letter from Kent Yalowitz to John Wirt, dated June 1, 2016 (annexed as Ex. F to DiBella Decl.). On June 13, 2016, the Wilder Parties filed the complaint in this action. See Compl.

The instant dispute is an attempt by the WOB Parties to obtain 15 emails "concerning Meldonium dated May 25, 2016," which the WOB Parties hope will "shed light on the [p]laintiffs' state of mind at the time they canceled the bout" following Povetkin's positive test for Meldonium. Defs. Reply at 2. The emails were produced by the Wilder Parties during discovery but when the WOB Parties exhibited the emails during depositions, the Wilder Parties invoked the "clawback" provision of the governing protective order. See Defs. Mem. at 1.

The Wilder Parties' privilege log includes these emails with the subject "Meldonium" and claims attorney-client privilege as to each.[2] See Privilege Log, filed Oct. 10, 2017 (annexed as Ex. E to Yalowitz Decl.), at *21.[3] Seven of the emails are duplicates — specifically emails involving Ron Rizzo, an employee of plaintiff DBE. See Jaffery 2d Decl. ¶ 9. The eight remaining emails were submitted for in camera review on January 16, 2018, at the Court's request.

---

[2] The Wilder Parties identify one additional document not on the privilege log that they believe the WOB Parties seek. See Jaffery Decl. ¶ 4. Because the Wilder Parties have publicly filed the document along with the Jaffery Declaration and disclaim any privilege, see id., we do not address the document here.

[3] Page numbers listed as "*__" refer to the pagination system produced by the ECF system.

The eight emails all relate to an email sent on May 25, 2016 by attorney John Wirt to Lou DiBella, Alex Dombroff, Shelly Finkel, and Al Haymon (the "Wirt Email"). See id. ¶ 8. The Wirt Email essentially set in motion the sending of the eight emails at issue. As already noted, John Wirt is an attorney who was retained by Wilder to assist in the negotiations with the WOB Parties over the bout and escrow agreements. See Deposition of Sheldon Finkel, dated Dec. 16, 2016 (annexed as Ex. C to Yalowitz Decl.) ("Finkel Dep."), at 99-100; Deposition of Alex Dombroff, dated Dec. 20, 2016 (annexed as Ex. D to Yalowitz Decl.) ("Dombroff Dep."), at 43-44; DiBella Decl. ¶¶ 10-13. Wirt did not represent DiBella, DBE, or co-managers Finkel and Haymon. See DiBella Decl. ¶ 13; Deposition of Louis DiBella, dated Dec. 9, 2016 (annexed in part as Ex. B to Yalowitz Decl. and in part as Ex. I to Yalowitz Reply Decl.) ("DiBella Dep."), at 129-30; Finkel Dep. at 99; Deposition of Alan Haymon, dated Jan. 5, 2017 (annexed as Ex. F to Yalowitz Decl.) ("Haymon Dep."), at 52. The other recipients of the Wirt Email — DiBella, Dombroff, Finkel, and Haymon — were involved in representing Wilder's interests in his fight with Povetkin. Finkel and Haymon are "co-managers of Deontay Wilder." Finkel Decl. ¶ 1; Finkel Dep. at 11; Haymon Dep. at 11. DiBella, a plaintiff in this case, is President of DBE and a boxing promoter, though he lost his bid to promote the Wilder-Povetkin Bout. DiBella Decl. ¶¶ 1, 5-7. Nonetheless, DBE and Wilder worked out an agreement under which DBE would be paid out of Wilder's winnings after the fight, and as part of the exchange, DBE would assist in Wilder's negotiations with the WOB Parties concerning the fight. Id. ¶¶ 7, 9. DiBella was a signatory to both the Bout and Escrow Agreements in his capacity as President of DBE. See Bout Agreement; Escrow Agreement. Dombroff is employed by DBE as "essentially an in-house counsel." Dombroff Dep. at 9. He describes "the focus of [his] responsibilities" as "the business and legal affairs of the company." Dombroff Decl. ¶ 1.

5

The Wirt Email analyzes the WOB Parties' mid-May explanation for the failed drug test that is at the heart of this dispute and discusses possible responses to it. Wirt recommends a course of action to the individuals receiving his email. The subsequent emails consist of discussions of Wirt's recommendation.

Wilder was not one of the recipients of the Wirt email. According to DiBella and Wilder himself, Wilder delegates "day-to-day negotiations surrounding his fights" to his team. DiBella Decl. ¶ 9 n.2; see also Deposition of Deontay Wilder, dated Dec. 7, 2016 (annexed as Ex. 4 to Jaffery Decl.), at 12 ("Most of the time if my manager Jay — Jay, I trust Jay full-heartedly. So sometime if he says it's okay, I'll briefly read it instead of proofread it . . . .").

The eight emails at issue fall into three categories.

First is an email authored by Shelly Finkel and addressed to DiBella, Dombroff, Haymon, and Wirt (hereinafter, the "Finkel Email").[4] This email forwards the Wirt email and contains Finkel's thoughts in response. Second are four emails from Sean Sullivan to Ron Rizzo.[5] Sullivan is employed at DBE as Lou DiBella's secretary. DiBella Dep. at 182-83. Rizzo also works at DBE where he is a vice-president and "Chief Administrative kind of guy." Id. at 50-51. In these four emails, Sullivan is forwarding the Wirt Email, the Finkel Email, a response from John Wirt to the Finkel Email, and an additional response from Finkel to Wirt clarifying his initial comments to the group and further explaining his thoughts. Third are three emails between Rizzo and Dombroff, and each includes the Wirt Email as part of the email

---

[4] Bates numbers PLWILD_0060133-34.

[5] Bates numbers PLWILD_0085431-32, PLWILD_0085442-49.

history.⁶  In them, Rizzo and Dombroff discuss Wirt's recommendation.

   B. Procedural History

This discovery dispute was raised with the Court initially in January 2017.  See Letter from Kent A. Yalowitz, dated Jan. 11, 2017 (Docket # 122).  Following briefing by letter, see Letter from Peter B. Schalk, dated Jan. 16, 2017 (Docket # 128); Letter from Kent A. Yalowitz, dated Jan. 18, 2017 (Docket # 130); Letter from Peter B. Schalk, dated Jan. 19, 2017 (Docket # 132), this Court decided that formal briefing was required but that resolution should be adjourned until after the February 6, 2017 trial of one of the issues in this matter.  See Order, dated Jan. 20, 2017 (Docket # 136).  In accordance with the January 20 Order, the WOB Parties renewed their motion to compel on October 10, 2017.

II. DISCUSSION

The Wilder Parties seek to protect the May 25, 2016 emails from disclosure under the attorney-client privilege and work-product doctrines.  Pls. Mem. at 7-15.  While we believe there are strong arguments that would have allowed Wilder to delegate to his advisors the task of obtaining confidential and privileged legal advice on his behalf, and thus that the emails are attorney-client privileged, the emails are also protectible under the work-product doctrine.  And because the WOB Parties have not shown a "substantial need" for the emails, any protection under the work-product doctrine will bar disclosure in the same manner as if they were found to be protected by attorney-client privilege.  Accordingly, we limit our discussion to the issue of the work-product doctrine.⁷

---

   ⁶ Bates numbers PLWILD_0085433-41.

   ⁷ The WOB Parties contend that the Wilder Parties waived any work-product protection by identifying the emails only as attorney-client privilege protected and not as work-product

A.  Law Governing Work-Product Protection

"Federal law governs the applicability of the work product doctrine in all actions in federal court."  Wultz v. Bank of China Ltd., 304 F.R.D. 384, 393 (S.D.N.Y. 2015) (citing Allied Irish Banks, P.L.C. v. Bank of Am., N.A., 252 F.R.D. 163, 173 (S.D.N.Y. 2008)).  Federal Rule of Civil Procedure 26(b)(3) codifies the doctrine, providing that "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)," unless "the party shows that it has a substantial need for the materials . . . and cannot, without undue hardship, obtain their equivalent by other means."  The work-product rule is designed "to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries."  United States v. Adlman, 134 F.3d 1194, 1196 (2d Cir. 1998) (quoting Hickman v. Taylor, 329 U.S. 495, 510-11 (1947)); accord United States. v. Nobles, 422 U.S. 225, 238-39 (1975).  The party asserting work-product protection must demonstrate that the material at issue "(1) [is] a document or a tangible thing, (2) that was prepared in anticipation of

---

protected in their privilege log.  Defs. Reply at 8.  While a specific identification is certainly required by Local Civil Rule 26.2(a) (requiring identification of "the nature of the privilege (including work product) which is being claimed"), "a district court has inherent authority to determine when to overlook or excuse a departure from its own local rules . . . ."  Phoenix Glob. Ventures, LLC v. Phoenix Hotel Assocs., Ltd., 422 F.3d 72, 75 (2d Cir. 2005).  Inasmuch as the Wilder Parties supplied the appropriate factual details about the documents in the privilege log and that no prejudice from the belated claim has inured to the WOB Parties, the Court will exercise its discretion to allow the claim of work-product protection.  See Strougo v. BEA Assocs., 199 F.R.D. 515, 523 (S.D.N.Y. 2001) (permitting assertion of work-product protection as basis for withholding even though it was omitted from privilege log where opposing party showed no prejudice); see also RMED Int'l, Inc. v. Sloan's Supermkts., Inc., 2003 WL 41996, at *3-4 (S.D.N.Y. Jan. 6, 2003) (permitting assertion of attorney-client privilege in privilege log submitted more than one year after it was due where no prejudice was shown).

litigation, and (3) was prepared by or for a party, or by his representative." Allied Irish Banks, P.L.C., 252 F.R.D. at 163-64 (internal quotation marks omitted) (quoting Allied Irish Banks, p.l.c. v. Bank of Am., N.A., 240 F.R.D. 96, 105 (S.D.N.Y. 2007)).

"Documents prepared in the ordinary course of business, or that would have been created whether or not litigation was anticipated, are not protected by work-product immunity. It is firmly established, however, that a document that assists in a business decision is protected by work-product immunity if the document was created because of the prospect of litigation." In re Copper Mkt. Antitrust Litig., 200 F.R.D. 213, 221 (S.D.N.Y. 2001) (citing Adlman, 134 F.3d at 1202). Ultimately, "in anticipation of litigation" means that "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." Costabile v. Cty. of Westchester, 254 F.R.D. 160, 164 (S.D.N.Y. 2008) (internal quotation marks omitted) (quoting Adlman, 134 F.3d at 1202).

A document that is prepared in anticipation of litigation need not be prepared by attorneys themselves in order to be work-product protected. Costabile, 254 F.R.D. at 164. The text of Rule 26(b)(3)(A) accords the protection to material prepared "by or for [a] party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Thus, the rule "afford[s] protection to materials gathered by non-attorneys even where there was no involvement by an attorney." Wultz, 304 F.R.D. at 394 (citing cases).

B. Analysis

The WOB Parties argue that the emails were not created in anticipation of litigation. See Defs. Mem. at 12; Pls. Mem. at 12. We disagree.

First, the historical context behind the emails reflects that the senders and recipients of

9

the emails created them because of the prospect of litigation. On May 15, 2016, the WBC postponed the fight, see Wilder vs. Povetkin Update, dated May 15, 2016 (annexed as Ex. G to Yalowitz Reply Decl.) ("WBC Update"), and on May 25, 2016, the WBC announced it would continue its investigation into Povetkin's positive test, see WBC Ruling Regarding Heavyweight Division Issued by WBC President Mauricio Sulaiman, dated May 25, 2016 (annexed as Ex. H to Yalowitz Reply Decl.) ("WBC Ruling"). Because Povetkin had tested positive for Meldonium, John Wirt needed to advise the Wilder Parties how to protect their interests in the purse held in escrow, DiBella Decl. ¶ 17, and thus sent the May 25 Wirt Email. According to a number of individuals in the Wilder camp, they anticipated litigation at that time, "because we did not expect that WOB would simply do the honorable thing and release the escrow money to the Wilder camp when faced with the breach of its obligation to produce Povetkin's services for a WBC sanctioned bout." Id.; accord Dombroff Decl. ¶ 3; Finkel Decl. ¶ 3; Wirt Decl. ¶ 3. DiBella further explained in his declaration that "litigation was a distinct possibility" following Povetkin's positive test, because "[i]t is an unfortunate fact that positive drug tests are a major source of litigation in the boxing world, and [accordingly,] this lawsuit was not difficult to foresee." DiBella Decl. ¶ 16. In line with this view, Wirt had sent a letter many days earlier, on May 15, 2016, to The Chicago Trust Company asserting that the WOB Parties "breached the WBC Championship Bout Agreement . . . with DBE and Mr. Wilder as a result of Mr. Povetkin having tested positive for Meldonium" and "demand[ing] that [The Chicago Trust Company] not disburse any of the Escrow Property unless and until [it] receives joint instruction from the parties or a non-appealable order from a court of competent jurisdiction." Wirt Letter at 2. The reference to a future "order from a court" obviously points to the anticipation of litigation.

The contents of the emails at issue, based on our in camera review, support the Wilder

Parties' position that the emails were generated because of the prospect of litigation. Adlman, 134 F.3d at 1202. In the Wirt Email, John Wirt, an attorney for Wilder, discusses his view of the then-existing evidence concerning Povetkin's positive test and recommends a course of action. Certainly, attorney views of this kind fit within the work-product doctrine. Id. at 1196 (purpose of the work-product rule is "to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries") (quoting Hickman, 329 U.S. at 510-11); see Crosby v. City of New York, 269 F.R.D. 267, 277 (S.D.N.Y. 2010) ("core work product . . . includes the mental impressions, conclusions, opinions, or legal theories of an attorney.") (internal quotation marks and citation omitted); Sec. & Exch. Comm'n v. Rosenfeld, 1997 WL 576021, at *3 (S.D.N.Y. Sept. 16, 1997) (protecting documents from disclosure that would reveal attorney's "areas of interrogation, mental impressions, and opinions concerning credibility"). The ensuing emails consist of back and forth between the recipients and Wirt regarding Wirt's recommendation.

The WOB Parties argue that the depositions of Dombroff and DiBella show that the Wilder Parties were not in fact anticipating litigation. Defs. Reply at 10. The WOB Parties point to DiBella's deposition testimony that on May 13, 2016, "he was not thinking of bringing a lawsuit . . . ." Id. Testimony about DiBella's state of mind on May 13, 2016, however, is not dispositive of his state of mind on May 25, 2016, given that the WBC did not announce that the fight was postponed until May 15, 2016, see WBC Update; Wirt did not send his demand letter to the escrow agent until May 15, see Wirt Letter; and the WBC did not announce that it would be continuing its investigation until May 25, 2016, see WBC Ruling, before the Wirt Email was sent. Thus, the situation had changed appreciably by the time of the May 25 emails and we have no reason to doubt DiBella's assertion that by May 25 he in fact anticipated litigation. See

DiBella Decl. ¶ 17. The comment in DiBella's deposition regarding "not thinking of bringing a lawsuit" was in reaction to a question that sought to determine whether on May 13, the Wilder camp was prepared to "skip the flight, not go to Moscow and sue." DiBella Dep. at 168. It does not relate to why the emails were being sent on May 25. As for Dombroff, he testified that he thought litigation was a "distinct possibility" after the failed drug test. Dombroff Dep. at 12-13. We do not view this testimony as undercutting DiBella's explanation of the team's views at that time.

The WOB Parties also argue that the Wilder Parties have not provided competent evidence showing that, even if the Wilder camp anticipated litigation, the May 25 emails were sent "because of" the prospect of litigation. See Defs. Reply at 9. As to this argument, the question is whether the emails "would have been prepared irrespective of the expected litigation." Adlman, 134 F.3d at 1204. The Second Circuit has held that even where "[t]here is little doubt under the evidence that [a party] had the prospect of litigation in mind when it directed the preparation of" documents, id. at 1204, or that "such documents might also help in preparation for litigation," id. at 1202, work-product protection is not available for "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of litigation," id. The determination we must make on this point is a factual one: would these emails have been generated had the exact same chain of events unfolded but if the parties had not anticipated any ensuing litigation?[8]

The WOB Parties fault the Wilder Parties for not providing an affidavit specifically

---

[8] As we have previously noted, this determination is in reality not a factual one but a "counterfactual" one because it "requires a court to consider what 'would have' happened had some set of factual circumstances existed other than the ones that actually existed." Wultz, 304 F.R.D. at 395 n.10 (citation omitted).

addressing what "would have" happened had there been no anticipation of litigation. Defs. Reply at 9. While we agree that it would have been better had such an affidavit been supplied, in this instance we have ample reason to find that the Wirt Email and the subsequent discussions were not something that would have occurred absent the potential for litigation. Wirt's recommendation in the Wirt Email and the ensuing discussion would have been unnecessary had it not been for the Wilder Parties' effort to stop the escrow agent from making any payments from the escrow account to the WOB Parties. As the circumstances make clear, Wirt made his recommendation in order to shore up Wilder's position for the purpose of staking out an adversarial position against the WOB Parties. The Wirt Email must also be viewed in light of Wirt's previous letter to the escrow agent suggesting that Wilder might potentially seek a court order to obtain the money in escrow, and the fact that the Wilder Parties could not reasonably have expected that the WOB Parties would have allowed release of the escrow absent litigation. For these reasons, and given that Wilder's job is to be a boxer and not an investigator of doping by adversaries, the Wilder Parties have met their burden of showing it was not part of the "ordinary course" of their business to have the discussion that is the subject of the emails at issue and that these discussions would not have occurred absent the potential for litigation.

III. CONCLUSION

For the foregoing reasons, the motion to compel (Docket # 270) is denied.

SO ORDERED.

Dated: March 14, 2018
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge