UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DEONTAY WILDER, et al.,                         :

                Plaintiffs,                :                <u>OPINION AND ORDER</u>

                                :                16 Civ. 4423 (ALC) (GWG)
                -v.-                                (Lead Case)
                                :


WORLD OF BOXING LLC, et al.,                 :

                Defendants.               :
------------------------------------------------------------X

GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE

      This case consists of two consolidated actions relating to a heavyweight championship

boxing match that was supposed to occur on May 21, 2016, but that never took place.

Heavyweight boxing champion Deontay Wilder and DiBella Entertainment, Inc. ("DBE") claim

that boxer Alexander Povetkin, who tested positive for a banned substance right before the

match was to take place, and World of Boxing LLC ("WOB"), breached two contracts relating to

that match and seek a declaratory judgment that they are owed money pursuant to an escrow

agreement covering the prize money for the bout.  WOB, Povetkin, and Andrey Ryabinskiy

(collectively the "WOB Parties") assert that Wilder, DBE, and Lou DiBella (collectively the

"Wilder Parties") breached these agreements and seek to have the escrowed money returned to

them.  All parties now move for summary judgment.[1]  For the reasons set forth below, both

---

[1] Wilder Parties' Notice of Motion, filed Nov. 13, 2017 (Docket # 284) ("Wilder Not.");
Declaration of Peter B. Schalk, filed Nov. 13, 2017 (Docket # 285) ("Schalk Decl."); Statement
of Facts Pursuant to Local Rule 56.1, Nov. 13, 2017 (Docket # 286); Memorandum of Law in
Support of Deontay Wilder, DiBella, Entertainment, Inc. and Lou DiBella's Motion for
Summary Judgment, filed Nov. 13, 2017 (Docket # 287) ("Wilder Mem."); Wilder Parties'
Amended Statement of Facts Pursuant to Local Rule 56.1, filed Nov. 14, 2017 (Docket # 288);
WOB Parties' Notice of Motion, filed Dec. 22, 2017 (Docket # 296) ("WOB Not.");
Memorandum of Law of World of Boxing LLC and Alexander Povetkin in Opposition to Motion

sides' motions are granted in part and denied in part.

## I. BACKGROUND

### A. Facts

The following facts are undisputed unless otherwise noted.

#### 1. The Parties and the Bout

The World Boxing Council ("WBC") is one of four major organizations that sanctions

professional boxing matches.  <u>See</u> Deposition of Deontay Wilder, dated Dec. 7, 2016 (annexed

---

for Summary Judgment and in Support of Cross-Motion for Summary Judgment, filed Dec. 22, 2017 (Docket # 297) ("WOB Mem."); Rule 56.1(a) Statement of Undisputed Facts by World of Boxing and Alexander Povetkin in Support of Their Motion for Summary Judgment, filed Dec. 22, 2017 (Docket # 298); WOB Parties' Rule 56.1(b) Response in Opposition to Plaintiffs' Motion for Summary Judgment, filed Dec. 22, 2017 (Docket # 299); Declaration of Maxim Kopylkov, filed Dec. 22, 2017 (Docket # 300); Declaration of Kent A. Yalowitz in Support of World of Boxing Parties' Motion for Summary Judgment and in Opposition to Wilder Parties' Motion for Summary Judgment, filed Dec. 22, 2017 (Docket # 301) ("Yalowitz Decl."); Second Declaration of Peter B. Schalk, filed Jan. 16, 2018 (Docket # 308); Declaration of Shelly Finkel, filed Jan. 16, 2018 (Docket # 309) ("Finkel Decl."); Declaration of Evan Solomon, filed Jan. 16, 2018 (Docket # 310); Reply Memorandum of Law in Further Support of Deontay Wilder, DiBella Entertainment, Inc. and Lou DiBella's Motion for Summary Judgment and in Opposition to World of Boxing LLC and Alexander Povetkin's Cross-Motion for Summary Judgment, filed Jan. 16, 2018 (Docket # 311) ("Wilder Reply"); Wilder Parties' Counter-Statement of Facts Pursuant to Local Rule 56.1, filed Jan. 17, 2018 (Docket # 312); Second Declaration of Kent A. Yalowitz in Support of World of Boxing Parties' Motion for Summary Judgment and in Opposition to Wilder Parties' Motion for Summary Judgment, filed Feb. 8, 2018 (Docket # 315); Reply Memorandum of World of Boxing LLC and Alexander Povetkin in Support of Cross-Motion for Summary Judgment, filed Feb. 9, 2018 (Docket # 316) ("WOB Reply"); Declaration of Jennifer Czerwinski, filed Feb. 9, 2018 (Docket # 317); Reply Declaration of Maxim Kopylkov, filed Feb. 9, 2018 (Docket # 318); Declaration of Carolyn Shanahan, filed Feb. 9, 2018 (Docket # 319); Declaration of James J. Thomas II, filed Feb. 9, 2018 (Docket # 320); Third Declaration of Peter B. Schalk, filed Feb. 22, 2018 (Docket # 326); Declaration of Ali R. Jaffery, Esq., filed Feb. 22, 2018 (Docket # 327); Sur Reply Memorandum of Law in Further Support of Deontay Wilder, DiBella Entertainment, Inc. and Lou DiBella's Motion for Summary Judgment and Opposition to World of Boxing LLC and Alexander Povetkin's Motion for Summary Judgment, filed Feb. 22, 2018 (Docket # 328); Supplemental Memorandum of World of Boxing LLC and Alexander Povetkin in Support of Cross-Motion for Summary Judgment, filed Mar. 1, 2018 (Docket # 329).

as Ex. 67 to Yalowitz Decl.) ("Wilder Dep."), at 14:10-14. At the time the parties entered into the contracts, Wilder was the WBC World Heavyweight Champion. See Declaration of Lou DiBella, dated Oct. 31, 2017 (annexed as Ex. 6 to Schalk Decl.) ("DiBella Decl."), at ¶ 4; WBC Championship Bout Agreement, dated Apr. 11, 2016 (annexed as Ex. 1 to Yalowitz Decl.) ("Bout Agreement"), at 1. Wilder had a management team that included Shelly Finkel, Jay Deas, and Al Haymon. See DiBella Decl. ¶ 1. Wilder's fights were often promoted by DBE, a promotional company whose founder and president was Lou DiBella. See DiBella Decl. ¶¶ 1, 6-7.

The WBC has issued Rules and Regulations governing the promotion of championship bouts. These rules give WBC discretion to designate a "mandatory challenger," against whom a WBC champion is required to defend his title. See Rules & Regulations of the WBC, updated Nov. 2015 (annexed as Ex. 7 to the Schalk Decl.) ("WBC R. & Regs."), at §§ 3.4, 3.7. These rules also provide that "[a]fter the WBC orders a bout, there shall be a period of thirty (30) days for the parties to negotiate, finalize, execute, and file a contract for the bout." Id. § 2.8. If no agreement is reached in that period, the rules permit the WBC to institute a "purse offer" procedure by which promoters bid at an auction for the right to promote the bout. Id. §§ 2.5-2.16. Out of the winning bid, 10% must then be set aside as a bonus for the bout's winner, and in a championship bout, 70% of the remaining 90% must be paid to the champion, and 30% of the remaining 90% to the challenger. See id. § 2.17. The promoter winning the purse offer must "within seven (7) days [after winning the purse offer] present championship bout contracts, either on WBC's form or in a form deemed acceptable by the WBC in its sole discretion, to each boxer or the boxer's representative to be signed and delivered to the WBC within twenty-one (21) calendar days after the purse offer ceremony." Id. § 2.21.

In early 2016, a heavyweight boxer named Alexander Povetkin was the mandatory challenger to Wilder's heavyweight title.  DiBella Decl. ¶ 4.  WOB, which is controlled by Alexander Ryabinskiy, promotes Povetkin's fights.  See id. ¶¶ 4-5.  Accordingly, WOB and DBE discussed making a contract under which they would jointly promote the Wilder-Povetkin bout (hereinafter the "Bout").  Id. ¶ 4.  The parties could not reach an agreement.  Id. ¶¶ 4-5. The right to promote the Bout was therefore the subject of a purse offer, following which WOB emerged as the winning bidder with a bid of $7.15 million.  Id. ¶ 5; Bout Agreement § 4.

2.  The Bout Agreement

Following the purse bid, more negotiations occurred in an effort to reach agreement on a bout contract.  See DiBella Decl. ¶ 9.  Although DBE was not the promoter of the Bout, DBE assisted Wilder's management team in negotiating with WOB and Povetkin.  Id.  During these negotiations, Wilder's management team also brought in an attorney named John Wirt to negotiate on their behalf.  See id. ¶¶ 1, 10, 13.

On April 11, 2016, the boxers, DBE, and WOB signed an agreement governing the Bout. See Bout Agreement.  The Bout Agreement provided that WOB "shall stage the WBC World Heavyweight Championship between [Wilder] and [Povetkin] at the Palace of Sports 'Megasport' in Moscow, Russia on the date of May 21, 2016, scheduled for 12 rounds."  Id. § 1. DBE was required to make Wilder's services available, and WOB was required to make Povetkin's services available.  Id.  The Bout Agreement also stated that Wilder agreed to arrive in Moscow at least seven days prior to the Bout (that is, May 14, 2016) to assist in "publicizing, advertising, and promoting" the Bout.  Id. § 11.

The Bout Agreement referenced the WBC Rules and Regulations.  It provided that "[t]he WBC Rules & Regulations shall govern the event in its entirety and shall be binding on all

Parties." Id. § 3. The Bout Agreement further provided that "[i]n the event that the Parties incur any dispute or controversy with respect to this contract, all parties understand and agree to be bound by the Rules and Regulations of the WBC." Id. § 14. In a separate clause, the Bout Agreement stated: "[t]he WBC shall exclusively perform any and all decisions, results, and actions relating to the Bout." Id. § 3.

The WBC Rules and Regulations include provisions addressing the use of performance enhancing drugs. The rules state that "[b]oxers rated or participating in any contest sanctioned by the WBC should not take, ingest, or have administered to him any substance, medicine, or drug . . . that may enhance or reduce the boxer's performance in the ring." See WBC R. & Regs. § 4.29. Under the rules, "[a] boxer who has been found to have tested positive for banned substances . . . shall be subject to such penalties or treatment as the WBC may determine appropriate in its sole discretion." Id. § 4.41. Additionally, the rules provide that

> since issues may arise as to whether or not: (I) a boxer's exposure to prohibited substances was intentional; (ii) such substance(s) provided the boxer with an advantage; (iii) the testing procedure was reliable; (iv) other facts should be considered; [] the WBC does not employ or adhere to a "strict liability" standard in anti-doping matters. In each case, the WBC may in its discretion consider all factors in making a determination regarding responsibility, relative fault, and penalties, if any.

Id. § 4.40.

The Bout Agreement itself contains the following provision relating to performance-enhancing drugs:

> [t]he WBC Clean Boxing Program ("CBP") shall be the exclusive program governing all aspects of anti-doping testing in both out-of-competition random testing and testing immediately after the Bout. As required by the WBC, testing under the CBP shall be performed by independent agency, the Voluntary Anti-Doping Association ("VADA"), and all sample collection management and transportation, testing and result reporting procedures and protocols shall be exclusively conducted by VADA and its officers and agents.

Bout Agreement § 7.  In turn, the CBP states that "[r]esponsibility for strict compliance and adherence to all WBC anti-doping requirements shall be the sole and exclusive responsibility of each Eligible Boxer."  WBC Clean Boxing Program (CBP) Testing and Results Management Guidelines (annexed as Ex. 25 to Schalk Decl.) ("CBP"), at § III.  However, the CBP also provides that, based on the same reasons provided in the Rules and Regulations, "the WBC may in its discretion consider all factors in making a determination regarding responsibility, relative fault, and penalties, if any."  Id. §§ V.G-H.

### 3.  The Escrow Agreement

With respect to Wilder's compensation, the Bout Agreement required WOB to "place in escrow no later than twenty-one (21) days prior to the bout, under terms and conditions satisfactory to the Champion and DBE, . . . US$4,369,365[], as the gross amount earned by the Champion."  See Bout Agreement § 4.  Accordingly, DBE, Wilder, WOB, and The Chicago Trust Company, N.A. ("CTC"), entered into an escrow agreement on April 19, 2016, in which CTC acted as escrow agent.  See Escrow Agreement, dated Apr. 19, 2016 (annexed as Ex. D to DiBella Decl.) ("Escrow Agreement").  Under the Escrow Agreement, WOB had to place $4,369,365 in escrow at least 21 days before the Bout.  See id. § 1.1.  The escrow agent was then to pay these funds to Wilder in two disbursements "upon receipt of an original invoice signed by Wilder, an original affidavit signed by Wilder . . . stating that the Bout . . . took place on May 21, 2016 and a copy of an article from www.fightnews.com, confirming that the Bout . . . took place on May 21, 2016."  Id. §§ 1.3(a)-(b).  Conversely, the agreement further provided that the escrow agent should disburse the funds to WOB

> [u]pon receipt by the Escrow Agent of an original affidavit signed by an officer of WOB, containing the signature and a seal of the notary public, stating that the Bout did not or will not take place on May 21, 2016 and a copy of an article from www.fightnews.com,

reporting that the Bout between Wilder and Povetkin is cancelled or postponed and did not or will not take place on May 21, 2016.

Id. § 1.3(c).

The escrow agent was required to notify the parties of disbursement requests and could not make a disbursement until two days elapsed following the notice. See id. § 1.3(d). If either party objected in writing to a disbursement during this two day waiting period, the escrow agent was forbidden from making any disbursement "unless and until it receives joint instruction from the parties or a non-appealable order from a court of competent jurisdiction, at which time it shall disburse the funds to the parties as their interests may appear." Id.

The Escrow Agreement further provided:

[t]he parties agree and acknowledge that the submission of an objection in writing to the Escrow Agent which is not made in good faith would cause harm to the party entitled to disbursement and because actual damages would be difficult to quantify, the party who has filed such objection agrees to pay liquidated damages to the party entitled to the disbursement in the amount of USD $2.5 million (two million five hundred thousand), not as a penalty but as a fair estimation of the loss suffered.

Id.

4. The Positive Drug Test

In drug tests performed on April 7, April 8, and April 11, 2016, urine samples that Povetkin submitted to VADA tested negative for performance enhancing drugs. See Letters from Margaret Goodman, dated April 21, 2016, and April 30, 2016 (annexed as Ex. 8 to Schalk Decl.). A VADA report dated May 12, 2016, however, indicated that a urine sample provided by Povetkin on April 27, 2016 tested positive for a substance known as Meldonium at an estimated concentration of 70 nanograms per millileter. See Drug Testing Report VADA3724, dated May 12, 2016 (annexed as Ex. 9 to Schalk Decl.). VADA reported this result to the WBC on May 13, 2016, and the WBC in turn announced that it was "conducting an in-depth

investigation of this matter" and was going to "make a public announcement in the very near future concerning the results of its investigation and any appropriate steps that it will take." See WBC Press Release, dated May 13, 2016 (annexed as Ex. 9 to Yalowitz Decl.) ("Positive Test Result"). The WBC further announced that its "priority is and will always be safety, fair play and justice." Id.

Meldonium is a prohibited substance. The World Anti-Doping Agency ("WADA"), whose list of prohibited substances VADA's own list "closely track[s]," see Deposition of Margaret Goodman, M.D., dated Jan. 27, 2017 (annexed as Ex. 74 to Yalowitz Decl.), at 21-22, proscribed Meldonium for the first time as of January 1, 2016, see WADA Notice — Meldonium, dated Apr. 11, 2016 (annexed as Ex. 5 to Yalowitz Decl.) ("WADA Apr. 11 Notice"), at 1. WADA posted notice of this change to its website and sent "the 2016 Prohibited List to all WADA stakeholders" on September 29, 2015. Id. However, WADA noted in an announcement dated April 11, 2016 that if Meldonium concentration in a urine sample were found to be below one microgram per milliliter and the test was taken prior to March 1, 2016, the results would be "compatible with an intake prior to January 2016 [and] [i]f the anti-doping organization finds that the athlete could not reasonably have known or suspected that the substance would still be present in his/her body on or after 1 January 2016, then a finding of no fault or negligence may be made." Id. at 3. In a June 30, 2016 announcement, WADA extended the ability to make a finding of no fault for such results in samples taken from March 1, 2016 through September 30, 2016 "in the absence of other evidence of use on or after 1 January, 2016." See WADA Notice — Meldonium, dated June 30, 2016 (annexed as Ex. 6 to Yalowitz Decl.), at 2.

5. <u>Effect of the Positive Drug Test</u>

Before the report of Povetkin's positive drug test, Wilder had traveled to Sheffield, England, to train for the May 21 fight and to acclimate to a time zone more closely resembling Moscow's. See Deposition of Alex Dombroff, dated Dec. 20, 2016 (annexed as Ex. 71 to Yalowitz Decl.) ("Dombroff Dep."), at 99-100. The Wilder Parties state that Wilder's original travel itinerary ensured that he would have been in Moscow to participate in the pre-fight promotional activities in which he was required to participate pursuant to the Bout Agreement. See Declaration of Alex Dombroff, dated Nov. 13, 2017 (annexed as Ex. 12 to Schalk Decl.) ("Dombroff Decl."), at ¶ 7. However, the WOB Parties note that even under Wilder's original itinerary, Wilder would have arrived in Moscow on May 15, 2016, see Deontay Wilder Itinerary Email, dated Apr. 11, 2016 (annexed as Ex. 44 to Yalowitz Decl.), one day after he was contractually obligated to arrive, see Bout Agreement § 11. In any event, after the WBC's May 13, 2016 announcement, the Wilder Parties did not board the originally planned flights to Moscow, and instead decided to wait for the WBC's ruling following its investigation, see Dombroff Dep. at 55, 86-87, 92-93; Wilder Dep. at 47-50; Deposition of Louis DiBella, dated Dec. 9, 2016 (annexed as Ex. 68 to Yalowitz Decl.) ("DiBella Dep."), at 151-55. This decision was made despite knowing that the fight had not yet been canceled or postponed and that it might still take place as planned. See DiBella Dep. at 157; Wilder Dep. at 72; Deposition of Jay Deas, dated Dec. 13, 2016 (annexed as Ex. 69 to Yalowitz Decl.), at 51.

While awaiting the results of the investigation, Wilder's management team and representatives prepared their public response. Jay Deas, a member of Wilder's management team, received a proposed press release from an individual named Timothy Smith stating that "Deontay Wilder has decided to cancel his title defense against Povetkin in Moscow on May 21." See Email from Timothy Smith to Jay Deas, dated May 14, 2016 (annexed as Ex. 24 to

Yalowitz Decl.), at 1.  The email containing this press release stated that it was drafted "if [Wilder] decides not to fight."  Id.  Deas also emailed Shelly Finkel, another member of Wilder's management team, and stated that "[t]he thought of postponing is a definite no."  See Email Chain Between Jay Deas and Shelly Finkel, dated May 13-14, 2016 (annexed as Ex. 22 to Yalowitz Decl.).  Meanwhile, Wirt, still working for Wilder's management team, emailed the WBC and stated that "we consider WOB and Mr. Povetkin in breach of the WBC Championship Bout Agreement."  See Email and Attachment from John Wirt to Mauricio Sulaiman et al., dated May 14, 2016 (annexed as Ex. 29 to Yalowitz Decl.) ("Wirt Email"), at attachment page 3.

On May 15, 2016, the WBC announced in a press release that it was postponing the Bout as it "diligently address[ed] the positive test result from the Clean Boxing Program for mandatory heavyweight challenger Alexander Povetkin," and that "the WBC will continue the investigation into the case."  WBC Wilder vs. Povetkin Update, dated May 15, 2016 (annexed as Ex. 15 to Schalk Decl.) ("Postponement Press Release").  The WBC stated that its decision to postpone the bout was made in "[k]eeping the priority of safety and also the principle of justice."[2]  Id.

Also on May 15, 2016, Wirt emailed a letter to Jennifer Czerwinski of CTC, stating that pursuant to Section 1.3(d) of the Escrow Agreement, "Mr. Wilder objects to CTC's disbursement of any of the Escrow Property to WOB if and when WOB makes a disbursement request to CTC because WOB and Mr. Povetkin have breached the [Bout Agreement]."  Email and Attachment

---

[2]  The WOB Parties point out that a contemporaneous ESPN article by a "Senior Writer" noted that "[h]ours after Wilder and his team skipped their flight [to Moscow], the WBC, having little choice with the titleholder preparing to return home, announced the fight was off and called it a postponement."  Dan Rafael, Deontay Wilder-Alexander Povetkin Title Fight Postponed, updated May 16, 2016 (annexed as Ex. 49 to Yalowitz Decl.) ("ESPN Postponement Article").  As explained in footnote 9 below, this article is inadmissible.

from John Wirt to Jennifer Czerwinski, dated May 15, 2016 (annexed as Ex. 35 to Yalowitz Decl.), at *4.[3]  This email referred to the fact that the WBC had postponed the bout and attached an article from www.boxingscene.com so stating.  See id. *4-7.

    6.  Aftermath

On June 1, 2016, Kent Yalowitz, counsel for WOB, sent a letter to Wirt demanding that the Wilder Parties withdraw their objection to CTC's disbursement of the escrowed funds, or else WOB would hold Wilder liable for "liquidated damages of USD $2.5 million, as provided for in Section 1.3(d) of the Escrow Agreement."  Emailed Letter from Kent A. Yalowitz to John Wirt, dated June 1, 2016 (annexed as Ex. F to DiBella Decl.), at 1.  The Wilder Parties did not withdraw their objection.

Following the postponement, the Wilder Parties and their associates repeatedly referred to the bout as "canceled."  On May 15, 2016, Deas sent messages to various individuals associated with the Wilder Parties indicating that they should refer to the bout as canceled, not postponed.  See Email from Timothy Smith to Jay Deas, dated May 15, 2016 (annexed as Ex. 31 to Yalowitz Decl.), at 1 ("Postponed is not to be used by our team.  Cancelled."); Email from Shelly Finkel to Jay Deas, dated May 15, 2016 (annexed as Ex. 32 to Yalowitz Decl.), at 1 ("[W]e should certainly use the term 'cancelled' not postponed.").  Likewise, sports reporters indicated on May 15, 2016 that Deas asserted that the fight had been canceled, not postponed. See Aaron Suttles, FIGHT IS OFF: Wilder's Management Says Canceled, Not Postponed, www.Tuscaloosanews.com, dated May 15, 2016 (annexed as Ex. 46 to Yalowitz Decl.), at 1 (noting that Jay Deas stated in an interview that "[t]here is no postponement.  It's canceled.");

───────────────

[3]  Pages cited as "*__" refer to the page numbers created by the ECF system.

Drew Champlin, Deontay Wilder's Title Fight with Alexander Povetkin Postponed by WBC, His Camp Says it's "Off," www.AL.com, dated May 15, 2016 (annexed as Ex. 47 to Yalowitz Decl.), at 2. Similarly, another journalist reported that Wilder himself stated "[a]s far as I'm concerned, there is no future for Deontay Wilder and Alexander Povetkin." Wil Esco, Deontay Wilder Frustrated by WBC, Claims Thousand of Boxers are Doping, www.badlefthook.com, dated May 24, 2016 (annexed as Ex. 53 to Yalowitz Decl.), at 3. Wilder also sent messages via WhatsApp to WBC representatives stating that he should "be given [his] full purs[]e no question[s] asked and [Povetkin] should be suspend[ed] immediately . . . ." See WhatsApp Messages Between Mauricio Sulaiman and Deontay Wilder, dated May 15, 2016 (annexed as Ex. 33 to Yalowitz Decl.), at *2.

### 7. Subsequent WBC Decisions

On May 25, 2016, the WBC granted Wilder the right to make a "voluntary defense of his title as reasonably soon as possible" while the WBC continued to investigate Povetkin's positive drug test. WBC Ruling Regarding Heavyweight Division, attached to Email dated May 25, 2016 (annexed as Ex. 11 to Yalowitz Decl.). Accordingly, on July 16, 2016, Wilder fought Chris Arreola in a voluntary defense of his title. See WBC Update Regarding the Status of the Heavyweight Division, Issued on Oct. 7, 2017 (annexed as Ex. 22 to Schalk Decl.) ("Oct. 7 Ruling"); DiBella Dep. 219-20. Wilder won this bout, but suffered a broken arm and a torn biceps muscle in so doing. See DiBella Dep. 218-20. These injuries were predicted to render Wilder inactive until January 2017. See Oct. 7 Ruling. The WBC also announced that in the meantime, Povetkin and another boxer, Bermane Stiverne, would compete for the WBC Interim Heavyweight Championship. See id.; see also WBC Heavyweight Division Status, Issued on Aug. 17, 2016 (annexed as Ex. 13 to Yalowitz Decl.) ("Aug. 17 Ruling Regarding Heavyweight

Division").

On August 17, 2016, the WBC issued a ruling regarding Povetkin's positive drug test.
See WBC Ruling Regarding Alexander Povetkin, Issued by WBC Board of Governors, dated
Aug. 17, 2016 (annexed as Ex. 12 to Yalowitz Decl.) ("Aug. 17 Ruling Regarding Povetkin").
In this ruling the WBC noted that "[i]n order to protect the welfare and health of the participants,
the WBC called the Bout [between Povetkin and Wilder] off and reserved any further ruling
until the ongoing investigation, inquiry and evaluation process concluded." Id. at 5. The WBC
further stated "it is not possible to ascertain that Mr. Povetkin ingested Meldonium after January
1, 2016." Id. This ruling remarked that "[a]s the CBP's Results Manager, the WBC has
complete discretion as to whether to impose any penalty to Mr. Povetkin," and that the WADA
established a "no fault" finding for Meldonium samples collected between January 1, 2016, and
September 30, 2016, for concentrations under one microgram per milliliter. Id. The ruling
provided that "[i]f during the course of the pending litigation between Mr. Povetkin and
Champion Wilder, the Court makes a final ruling that differs from the findings set forth herein,
the WBC shall have the right to review this ruling and take any course of action it may deem
appropriate." Id. The referenced "pending litigation" was this lawsuit.

The Wilder Parties appealed the WBC's finding regarding Povetkin's failed drug test, see
Article V Appeal of WBC's Ruling Regarding Alexander Povetkin's Positive Drug Test for
Meldonium, dated Sept. 1, 2016 (annexed as Ex. 61 to Yalowitz Decl.), and the WBC issued
another ruling on October 7, 2016, see Oct. 7 Ruling. In this later ruling, the WBC stated that its
earlier ruling "was not intended to convey, and should not be construed as conveying, a
conclusion about whether Mr. Povetkin did or did not take Meldonium after it became a banned
substance on January 1, 2016." Id. This ruling further stated that

> [t]he litigation pending between Wilder and Povetkin is going to trial in February of 2017. If Mr. Wilder prevails at that trial, the WBC shall afford Mr. Povetkin the opportunity to show that the trial's result was not based on a finding that Mr. Povetkin ingested Meldonium after January 1, 2016. If Mr. Povetkin fails to make that showing theWBC shall: (a) withdraw recognition of Povetkin as Interim World Champion (if he wins that title); (b) withdraw any mandatory challenger status he might have; and (c) impose any penalties upon Mr. Povetkin as per the WBC Clean Boxing Program Protocol, which includes suspensions and fines.

Id. at *3.

### 8. Trial

A trial in this matter was scheduled to take place on February 6, 2017. See Order, filed Dec. 23, 2016 (Docket # 94), at 1. On December 23, 2016, this Court ordered that the trial "be limited to the issue of whether Povetkin ingested Meldonium on or after January 1, 2016," id., the date on which WADA began listing Meldonium as a banned substance, see WADA Apr. 11 Notice at 1. The WOB Parties never objected to this procedure. See Order, filed Sept. 26, 2017 (Docket # 266) ("Rule 50 Order"), at 3. The trial was held, and on February 13, 2017, the jury found that "plaintiffs prove[d] by a preponderance of the evidence that Mr. Povetkin ingested Meldonium on or after January 1, 2016[.]" See Verdict Form, filed Feb. 14, 2017 (Docket # 225) ("Jury Verdict"). The WOB Parties moved for judgment as a matter of law pursuant to Rule 50, which was denied on April 26, 2017. See Rule 50 Order at 2.

### 9. Povetkin's Second Positive Test and Subsequent Rulings

Meanwhile, Povetkin's bout with Stiverne for the Interim Heavyweight Championship was scheduled to take place on December 17, 2016. See WBC Ruling Regarding Alexander Povetkin, Issued by WBC Board of Governors on Mar. 2, 2017 (annexed as Ex. 15 to Yalowitz Decl.), at 1. However, on December 16, 2016, Povetkin tested positive for Ostarine, another banned substance, causing the WBC to withdraw its sanction of the bout and suspend Povetkin

indefinitely, pending further investigation.  Id.

In light of Povetkin's subsequent failed drug test and the result at trial, the WBC issued a new ruling on March 2, 2017.  See id.  In this ruling, the WBC acknowledged the jury's verdict in this case, as well as Povetkin's positive test for Ostarine.  See id. at 2.  Based on these findings, the WBC Board of Governors ruled that Povetkin was indefinitely suspended from participating in any WBC-sanctioned bout, pending payment of a $250,000 fine to the WBC and his compliance for one year with a specific testing protocol designed by VADA, among other conditions.  See id.  The ruling also stated that Povetkin would have the "opportunity to submit additional evidence at a time and in a form the WBC will determine at its sole discretion concerning his positive test for Ostarine."  Id.  The ruling noted the possibility that the WBC would issue a supplemental ruling after considering any additional evidence.  Id.

Povetkin appealed the WBC's March 2, 2017 ruling.  See WBC Supplemental Ruling Regarding Alexander Povetkin, Issued by WBC Board of Governors on Nov. 7, 2017 (annexed as Ex. 16 to Yalowitz Decl.) ("Nov. 7 Ruling"), at 2.  In ruling on this appeal, the WBC found that "notwithstanding the specific finding of the jury in the New York Litigation, the WBC continues to adhere to its ruling of August 17, 2016 that it is not possible to ascertain that Mr. Povetkin ingested Meldonium after January 1, 2016."  Id. at 3.  In so doing, the WBC enumerated several bases supporting this decision, including that "an article published by members of the WADA-accredited Cologne Laboratory reported that Meldonium can remain detectable in urine for more than five months"; (ii) that a report submitted by a doctor at a WADA-accredited laboratory "concluded that the data suggests the presence of Meldonium at low concentrations in the April of 2016 samples that UCLA reported as negative"; (iii) that on May 17, 2017, WADA issued a document instructing WADA-accredited laboratories to not

report Meldonium at levels below 100 nanograms per milliliter, and thus Povetkin's test result finding 70 nanograms per milliliter would not have been reported as adverse if made after this finding; and (iv) other than the positive Meldonium and Ostarine tests, Povetkin had been tested under the CBP six other times, and the results for all of these tests came back negative. Id. at 2-3.[4] Accordingly, the WBC, among other things, amended Povetkin's indefinite suspension to a one year suspension from the date of his positive test for Ostarine. See id. at 4.

B. Procedural History of this Case

The first of the two instant actions was filed by Wilder and DBE on June 13, 2016, several weeks after the postponement of the May 21 bout. See Complaint, filed June 13, 2016 (Docket # 1). In the first action, Wilder and DBE alleged that Povetkin and WOB breached the Bout Agreement and Escrow Agreement. Id. ¶¶ 56-62. Wilder and DBE also sought a declaratory judgment stating that Wilder and DBE were entitled to the funds held in escrow. See id. ¶¶ 63-69. On June 23, 2016, the WOB Parties filed a complaint against the Wilder Parties alleging that the Wilder Parties breached the Bout Agreement and Escrow Agreement and defamed Povetkin. See Complaint and Demand for Jury Trial, World of Boxing LLC v. Wilder, 16 Civ. 4870 (S.D.N.Y. June 23, 2016) (Docket # 1), at ¶¶ 73-94. On August 8, 2016, Povetkin and WOB answered the complaint in Wilder and DBE's action and interposed two counterclaims — one for breach of the Bout Agreement and another for breach of the Escrow Agreement. See Answer, Defenses and Counterclaims of Defendant World of Boxing to Plaintiffs' Complaint, filed Aug. 8, 2016 (Docket # 8), at Counterclaims ¶¶ 1-17. Povetkin and WOB filed an amended answer on September 27, 2016, in which they reiterated their original

---

[4] None of the evidence cited in this ruling had been presented in the February 2017 trial.

counterclaims and added a counterclaim for the breach of the implied covenant of good faith and fair dealing.  See Amended Counterclaims, Answer, and Defenses of Defendants and Counterclaim Plaintiffs World of Boxing and Alexander Povetkin to Plaintiffs' and Counterclaim Defendants' Complaint, filed Sept. 27, 2016 (Docket # 14) ("Am. Answer"), at Counterclaims ¶¶ 81-101.

The WOB Parties thereafter filed an amended complaint in their own action on September 28, 2016, alleging the same claims that they asserted as counterclaims in the action brought by Wilder and DBE.  See Amended Complaint and Demand for Jury Trial, World of Boxing LLC, 16 Civ. 4870 (S.D.N.Y. Sept. 28, 2016) (Docket # 30), at ¶¶ 83-109.  By Order dated October 6, 2016, the Court consolidated the two actions for all purposes.  See Memo Endorsement, filed Oct. 6, 2016 (Docket # 19).

The Wilder Parties made the instant motion for summary judgment on November 13, 2017.  See Wilder Not.  The WOB Parties responded and cross-moved for summary judgment on December 22, 2017.  See WOB Not.

## II. LAW GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states that summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)); Beard v. Banks, 548 U.S. 521, 529 (2006) (citing Celotex, 447 U.S. at 323).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, "[t]he evidence of the

non-movant is to be believed," and the court must draw "all justifiable inferences" in favor of the non-moving party.  Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).  Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis and additional citation omitted), and "may not rely on conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citation omitted).  In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor."  Anderson, 477 U.S. at 256.  Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.'" Nebraska v. Wyoming, 507 U.S. 584, 590 (1993) (quoting Celotex, 477 U.S. at 322) (alteration in original).  Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case."  Allen v. Cuomo, 100 F.3d 253, 258 (2d Cir. 1996) (citing Anderson, 477 U.S. at 247-48).

III.  LAW GOVERNING BREACH OF CONTRACT

Under New York law, the elements of a claim for breach of contract are: "[1] the existence of a contract, [2] the plaintiff's performance thereunder, [3] the defendant's breach thereof, and [4] resulting damages." Harris v. Seward Park Hous. Corp., 79 A.D.3d 425, 426 (1st Dep't 2010) (citing Morris v. 702 E. Fifth St. HDFC, 46 A.D.3d 478 (1st Dep't 2007)); accord Palmetto Partners, L.P. v. AJW Qualified Partners, LLC, 83 A.D.3d 804, 806 (2d Dep't

2011).[5]

When interpreting a contract, "[t]he objective . . . is to determine what is the intention of the parties as derived from the language employed." Lopez v. Fernandito's Antique, Ltd., 305 A.D.2d 218, 219 (1st Dep't 2003) (internal quotation marks omitted) (quoting Hartford Accident & Indem. Co. v. Wesolowski, 33 N.Y.2d 169, 171-72 (1973)). This requires consideration of "not merely literal language, but whatever may be reasonably implied therefrom." Sutton v. E. River Sav. Bank, 55 N.Y.2d 550, 555 (1982) (citations omitted). Nevertheless, when an agreement is "clear and unambiguous on its face" then that agreement "must be enforced according to the plain meaning of its terms." Duane Reade, Inc. v. Cardtronics, LP, 54 A.D.3d 137, 140 (1st Dep't 2008) (internal quotation marks omitted) (citing Greenfield v. Phillies Records, 98 N.Y.2d 562, 569 (2002)).

"Whether a contractual term is ambiguous must be determined by the court as a matter of law, looking solely to the plain language used by the parties within the four corners of the contract to discern its meaning and not to extrinsic sources." Id. (citing Kass v. Kass, 91 N.Y.2d 554, 566 (1998)). However, "[w]hen the language of a contract is ambiguous, its construction presents a question of fact which may not be resolved by the court on a motion for summary judgment." Van Etten Oil Co. v. Aero Star Petroleum, Inc., 131 A.D.3d 740, 741 (3d Dep't

---

[5] New York law governs the disputes under both contracts. See Bout Agreement § 21 ("This Agreement shall be governed by the substantive law of contracts of the State of New York."); Escrow Agreement § 4.4 ("This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of New York."). Also, the parties' briefs assume that New York law applies. See, e.g., Wilder Parties' Mem. at 19, 33; WOB Mem. at 20 n.9, 27. Accordingly, we will apply New York law. See Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such 'implied consent . . . is sufficient to establish choice of law.'") (alteration in original) (quoting Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989)).

2015) (internal quotation marks omitted) (quoting <u>Leon v. Lukash</u>, 121 A.D.2d 693, 694 (2d Dep't 1986)); <u>accord</u> <u>Yanuck v. Paston & Sons Agency, Inc.</u>, 209 A.D.2d 207, 208 (1st Dep't 1994) ("[W]here . . . contract terms or provisions [are] susceptible to at least two reasonable interpretations, and intent must be gleaned from disputed evidence or from inferences outside the written words, it becomes an issue of fact that must be resolved by trial.") (citing <u>Amusement Bus. Underwriters v. Am. Int'l Grp.</u>, 66 N.Y.2d 878, 880-81 (1985)).

"The courts should construe a contract in a manner that avoids inconsistencies and reasonably harmonizes its terms." <u>Gessin Elec. Contractors, Inc. v. 95 Wall Assocs., LLC</u>, 74 A.D.3d 516, 518 (1st Dep't 2010) (citing <u>James v. Jamie Towers Hous. Co.</u>, 294 A.D.2d 268, 269 (1st Dep't 2002), <u>aff'd</u>, 99 N.Y.2d 639 (2003)).  Similarly, "[a] contract should not be interpreted to produce a result that is absurd." <u>Lipper Holdings v. Trident Holdings</u>, 1 A.D.3d 170, 171 (1st Dep't 2003) (citing <u>Tougher Heating & Plumbing Co. v. State of New York</u>, 73 A.D.2d 732 (3d Dep't 1979)); <u>accord</u> <u>Natixis Real Estate Capital Tr. 2007-HE2 v. Natixis Real Estate Holdings, LLC</u>, 149 A.D.3d 127, 139 (1st Dep't 2017).

Finally, "[a]s a matter of law, if a contract makes reference to extraneous rules or regulations, the content of those rules or regulations is incorporated into the contract's terms." <u>World of Boxing LLC v. King</u>, 56 F. Supp. 3d 507, 511 (S.D.N.Y. 2014) (citing <u>This Is Me, Inc. v. Taylor</u>, 157 F.3d 139, 144 (2d Cir. 1998)).

IV.  <u>DISCUSSION</u>

    A.  <u>Breach of the Bout Agreement</u>

Each side has moved for summary judgment on their claims that the opposing side breached the Bout Agreement.  <u>See</u> Wilder Mem. at 19; WOB Mem. at 29.  We discuss the claims against each set of parties separately.

### 1. Whether the WOB Parties Breached the Bout Agreement

The Wilder Parties argue Povetkin breached the Bout Agreement by ingesting and testing positive for Meldonium after it became a banned substance, in violation of the CBP, and that WOB breached the Bout Agreement by failing to stage the Bout on May 21, 2016, and failing to make Povetkin's services available on that date. See Wilder Mem. at 21-23.

#### (a) Povetkin

It has been conclusively determined as a result of the jury trial in this matter that Povetkin ingested Meldonium after January 1, 2016. See Jury Verdict. It is undisputed that Povetkin's urine sample provided to VADA on April 27, 2016 tested positive for Meldonium. See Positive Test Result. Nonetheless, neither of these is a breach of the Bout Agreement.

We begin by noting that the Bout Agreement contains no language mandating that each fighter refrain from ingesting banned substances. Rather, it provides that "[t]he WBC [CBP] shall be the exclusive program governing all aspects of anti-doping testing in both out-of-competition random testing and testing immediately after the Bout." Bout Agreement § 7. In turn, the CBP, states that "[r]esponsibility for strict compliance and adherence to all WBC anti-doping requirements shall be the sole and exclusive responsibility of each Eligible Boxer." CBP § III. It is this provision that the Wilder Parties allege was breached by Povetkin. See Wilder Mem. at 23 (citing CBP § III).

Nevertheless, that provision does not require absolute abstinence from the use of banned substances, but by its terms requires that the boxer abide by "WBC anti-doping requirements." In turn, the CBP also provides that "the WBC shall have complete discretion to rule on culpability . . . . [And] may in its discretion consider all factors in making a determination regarding responsibility, relative fault, and penalties, if any." See CBP §§ V.G-H. The parties to

21

the Bout Agreement thus agreed that the WBC's ruling would be conclusive as to whether the "WBC anti-doping requirements" were breached. In this case, after issuing several conflicting and indecisive rulings, the WBC finally decided on November 7, 2017 that notwithstanding the jury's verdict in this case, it would adhere to its earlier decision that it was not possible to determine whether Povetkin ingested Meldonium after January 1, 2016. See Nov. 7 Ruling at 3. In other words, the WBC exercised its discretion to determine that Povetkin did not violate the CBP. The WBC's exercise of that discretion was specifically agreed to by the parties to the Bout Agreement and they are thus now bound by it. To conclude otherwise would require this Court to determine that Povetkin breached the contract by failing to abide by "WBC anti-doping requirements" when the parties specifically agreed that WBC's decision on this question would be conclusive. Bout Agreement § 7; CBP § III, V.G-H.

The Wilder Parties respond to this reasoning in several ways. First, the Wilder Parties note that the WBC Rules and Regulations state that "[b]oxers rated or participating in any contest sanctioned by the WBC should not take, ingest, or have administered to him any substance, medicine, or drug . . . that may enhance or reduce the boxer's performance in the ring." WBC R. & Regs. § 4.29. The Wilder Parties in their complaint did not allege that Povetkin breached this provision and did not raise the issue until their reply brief. See Wilder Reply at 21. In any event, this provision must be read in concert with Rule 4.40 of the WBC's rules, which states that the WBC does not abide by a "strict liability" standard, and vests the WBC with discretion to determine whether a boxer was responsible for violating its anti-doping policy. WBC R. & Regs. § 4.40. The parties thus left it up to the WBC to determine whether its rules were violated. Moreover, the language used in Rule 4.29 — "should not" instead of "shall not" — would not by itself allow the conclusion that ingestion of a performance-enhancing drug

violated the Bout Agreement.  As one case has noted "the use of the word 'should' does not automatically denote either a mandatory or a permissive direction.  Rather, the meaning depends on the context in which the words are found."  Bord v. Rubin, 1998 WL 420777, at *4 (S.D.N.Y. July 27, 1998) (citing cases).  Here, the meaning of the word "should" is informed by the remainder of the WBC rules — in particular the WBC's statement that there is no "strict liability" standard and its arrogation to itself of the prerogative of deciding how ingestion of performance-enhancing substances will be treated.  In these circumstances, the Wilder Parties have not shown that Povetkin's ingestion of or positive test for Meldonium was by itself a breach of the Bout Agreement.

The Wilder Parties argue that the WBC does not have discretion to decide whether Povetkin violated the Bout Agreement because the Bout Agreement is a dispute between private parties, and the agreement designates the United States District Court for the Southern District of New York as the forum in which disputes regarding its terms are to be litigated.  See Wilder Reply at 2-4.  The only cases the Wilder Parties cite in support of this argument, see id. at 3, are irrelevant because they deal only with the scope of arbitration clauses, not with the substantive question of how a contract incorporating rules of a private organization should be interpreted.  As already discussed, the Bout Agreement makes reference to the CBP and the WBC Rules and Regulations, which vest the WBC with discretion to make certain determinations, including whether a boxer has complied with anti-doping requirements.  See CBP §§ III, V.G-H.  Although the forum selection clause here plainly permitted suit to be filed in this Court, it does not address any issue of contract interpretation.  In this case, the parties ceded a substantial amount of control over the performance of the Bout Agreement to the WBC.  That this Court accepts this aspect of the Bout Agreement does not represent any failure by this Court to

exercise jurisdiction. To the contrary, doing so implements the intent of the parties.

The Wilder Parties argue, <u>see</u> Wilder Reply at 4-7, that the Court already decided the issue of whether the WBC retained discretion to determine whether Povetkin violated the anti-doping provisions of the contract, pointing to an exchange at a December 15, 2017 conference in which the Court rejected WOB's argument that submitting the issue of whether Povetkin ingested meldonium to a jury would amount to an "advisory opinion." Transcript, dated Dec. 15, 2016 (Docket # 104), at 72-74. All that the Court determined during that exchange, however, was that the question of Povetkin's ingestion of meldonium was "an issue in the case" and that the jury's verdict would be "binding." <u>Id.</u> at 72. Povetkin's ingestion of meldonium was an "issue in the case" because Wilder asserted that it amounted to a breach of the contract (even if the Court has now rejected this argument following summary judgment briefing) and because it may be a defense to some or all of the allegations of defamation. The ruling at the December 15, 2017 conference did not represent a judicial determination regarding any arguments the WOB Parties could assert regarding the interpretation of the Bout Agreement.

Finally, citing no case law, the Wilder Parties argue that Povetkin breached the Bout Agreement because Povetkin's positive test, as determined by VADA, "proximately caused" the WBC to call off the Bout. <u>See</u> Wilder Reply at 11-12. However, this argument begs the question of whether Povetkin's ingestion of meldonium was a breach of the Bout Agreement. As already discussed, it did not constitute a breach.

Accordingly, the WOB Parties' motion for summary judgment on the Wilder Parties' claim that Povetkin breached the Bout Agreement is granted.[6]

---

[6] The Wilder Parties argue that they should be entitled to reopen discovery so that the Wilder Parties may "seek documents, including financial records, and depositions of WBC

(b) WOB

The Wilder Parties argue that WOB breached the Bout Agreement by not promoting the Bout on May 21, 2016 or providing Povetkin's services for it. Wilder Mem. at 21-22. The Bout Agreement provided that "[WOB] shall stage the WBC World Heavyweight Championship between the Champion and the Challenger at the Palace of Sports 'Megasport' in Moscow, Russia on the date of May 21, 2016 . . . ." See Bout Agreement § 1. WOB did not stage the fight on May 21, 2016 (or on any date thereafter). Were we to ignore all other provisions of the Bout Agreement, there would be no question that WOB breached the Bout Agreement by not staging the Bout.

In fact, the structure and language of the Bout Agreement make clear that WOB did not breach the agreement. Specifically, the Bout Agreement provides that the WBC "shall exclusively perform any and all decisions, results, and actions relating to the Bout." Id. § 3. In other words, the Bout Agreement gives the WBC complete power over the Bout's staging. In a similar vein, the Bout Agreement provides that "the WBC has and reserves the rights, in its discretion . . . to not certify any contest as being for the WBC-recognized World Heavyweight

---

witnesses" to determine whether WOB improperly influenced the WBC in making its November 7 ruling — implying that discovery might reveal that the ruling came about as part of a quid pro quo. Wilder Reply at 11. While we are doubtful that any such proof would show a breach of the Bout Agreement, it is enough to say that discovery as to all non-defamation claims concluded long ago and the Wilder Parties have not submitted an affidavit compliant with Fed. R. Civ. P. 56(d) and case law interpreting that provision, see, e.g., Paddineton Partners v. Bouchard, 34 F.3d 1132, 1138 (2d Cir. 1994), that would permit an adjournment to obtain such discovery. Even if they did, the request would be denied because Rule 56(d) (formerly Rule 56(f)) "applies to summary judgment motions made before discovery is concluded." McAllister v. N.Y.C. Police Dep't, 49 F. Supp. 2d 688, 696 n.5 (S.D.N.Y. 1999) (emphasis added) (citations omitted); accord McNerney v. Archer Daniels Midland Co., 164 F.R.D. 584, 588 (W.D.N.Y. 1995) ("Applications to extend the discovery deadline must be made prior to expiration of the deadline . . . . Rule 56(f) is not intended to circumvent discovery orders.").

Championship." Id. § 2. This provision is significant because the Bout Agreement explicitly recognizes that its purpose is to provide for the staging of a "World Boxing Council . . . . World Heavyweight Championship bout." Id. at 1. By agreeing to these provisions, the parties ceded control over certain aspects of their obligations under the Bout Agreement to the WBC. Most pertinently, the parties recognized the WBC's authority to cancel or change the date of the Bout, inasmuch as such an action would constitute a "decision[] . . . relating to the Bout." Id. § 3. Additionally, if the WBC did not "certify" the bout "as being for the WBC-recognized World Heavyweight Championship," id. § 3, the entire purpose of the Bout Agreement would be lost.

That is precisely what happened here. On May 15, 2016, the WBC declined to allow the fight to go forward on May 21, 2016, after Povetkin's positive test for Meldonium. See Postponement Press Release. That decision superseded WOB's obligation to stage the Bout for the WBC World Heavyweight Championship on May 21, 2016. If we were to conclude, as the Wilder Parties seemingly argue, that WOB was required to stage the Bout notwithstanding the WBC's decision, such a staging would conflict with the clause that allowed the WBC to make all "decisions" and take any "actions" that "relat[e] to the Bout." Bout Agreement § 3. It would also conflict with the stated purpose of the contract, which was to stage a "WBC-recognized World Heavyweight Championship bout." Id. at 1. Given the power of control vested in the WBC, once the WBC canceled the Bout, the contract could not be read to also impose an obligation on WOB to stage the same Bout.

The conclusion that WOB did not breach the Bout Agreement by not staging the Bout on May 21, 2016, fully accords with the principle under New York law that courts "should construe a contract in a manner that avoids inconsistencies and reasonably harmonizes its terms." Gessin Elec. Contractors, Inc., 74 A.D.3d at 518 (citation omitted). Here, the Bout Agreement's

26

provisions are easily harmonized by reading the date provided for in the Bout Agreement as subject to the WBC's ability to change it. Our interpretation also avoids the "absurd" result of obligating WOB to stage a bout that was not contemplated by the Bout Agreement. See Lipper Holdings, 1 A.D.3d at 171 ("A contract should not be interpreted to produce a result that is absurd.") (citation omitted).

For this reason, the case most heavily relied on by the Wilder Parties, World of Boxing LLC v. King, 56 F. Supp. 3d 507 (S.D.N.Y. 2014), is inapposite. There, a boxing match sanctioned by the World Boxing Association was called off after one of the boxers, Guillermo Jones, tested positive for a performance enhancing drug. Id. at 509-10. WOB, a promoter of the other boxer in that match, sued on the ground that Jones's promoter breached the contractual requirement that he "cause [Jones] to participate in a 12 Round WBA Cruiserweight World Title match" against WOB's boxer. Id. at 512. The Court found that Jones's promoter was liable for breach because the WBA's rules required the suspension of any boxer who tested positive for a banned, performance-enhancing substance, thereby rendering it impossible for Jones's promoter to fulfill his contractual obligation.[7] See id. at 512-15. By contrast, the Bout Agreement here provided the WBC with discretion to both determine whether its anti-doping requirements had been violated, and to make decisions about whether the Bout would be held on the date provided in the Bout Agreement.

Accordingly, WOB is entitled to summary judgment dismissing Wilder's claim that it

---

[7] The court also noted there that impossibility provided no defense because Jones's positive test was foreseeable. See King, 56 F. Supp. 3d at 513-15.

breached the Bout Agreement.[8]

## 2. Whether the Wilder Parties Breached the Bout Agreement

The WOB Parties claim that Wilder breached the Bout Agreement by

(a) declaring Mr. Povetkin and WOB to be "in breach" and announcing publicly that the bout had been "canceled," and not "postponed"; (b) failing to travel to Moscow as promised in the contract; (c) entering into an agreement to participate in another boxing match, which interfered with his ability to perform his obligations under the contract, in violation of his representation and warranty not to do so; and (d) commencing an action for breach of the Bout Agreement.

WOB Mem. at 29.

While there are arguments that none of these acts constitutes a material breach of the Bout Agreement, we do not find it necessary to reach this question. As already noted, the WOB Parties cannot prevail by showing merely that they performed under the Bout Agreement and the opposing party breached it; rather, they must also show "resulting" damages. Harris, 79 A.D.3d at 426. Under New York law, "[c]ausation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach directly and proximately caused his or her damages." Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir. 2004) (emphasis in original) (citing Wakeman v. Wheeler & Wilson Mfg. Co., 101 N.Y.205, 209 (1886)). This requires a showing that the damages were "directly traceable to the breach, not remote or the result of other intervening causes." Wenger v. Alidad, 265 A.D.2d 322, 323 (2d Dep't 1999) (quoting Kenford Co. v. Cty. of Erie, 67 N.Y.2d 257, 261 (1986) and Wai Ming Ng v. Tow, 260 A.D.2d 574, 574 (2d Dep't 1999)); see also Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 110 (2d Cir. 2007) ("'Certainty,' as it pertains to

---

[8] Because we find that the Bout Agreement allowed the WBC to change the date on which WOB's performance was due, it is not necessary to reach WOB's argument that the date was not a material term of the Bout Agreement. See WOB Mem. at 27.

general damages, refers to the <u>fact</u> of damage, not the amount."). "Where a party has failed to come forward with evidence sufficient to demonstrate damages flowing from the breach alleged and relies, instead, on wholly speculative theories of damages, dismissal of the breach of contract claim is in order." <u>Lexington 360 Assocs. v. First Union Nat'l Bank of N.C.</u>, 234 A.D.2d 187, 190 (1st Dep't 1996) (citation omitted) (granting summary judgment on the ground that plaintiff failed to advance any theory of damages supported by the record showing that damages were attributable to a breach).

WOB and Povetkin seek to recover damages based on different theories. WOB seeks to recover the costs it incurred in performing the Bout Agreement — that is, reliance damages, <u>see</u> WOB Mem. at 33-34 — the purpose of which are to "restore [the non-breaching party] to the position in which it would have been had it not relied on defendant's alleged promise," <u>see</u> <u>Clifford R. Gray, Inc. v. LeChase Constr. Servs.</u>, 51 A.D.3d 1169, 1170 (3d Dep't 2008) (citations omitted). For his part, Povetkin seeks to recover the amount he would have earned had the Bout taken place — that is, expectation damages, <u>see</u> WOB Mem. at 34-35 — which is "the amount necessary to put [plaintiff] in as good a position as [he] would have been if the defendant had abided by the contract," <u>Trans World Metals, Inc. v. Southwire Co.</u>, 769 F.2d 902, 908 (2d Cir. 1985) (internal quotation marks and citation omitted). Neither WOB nor Povetkin may collect damages, however, because even drawing all reasonable inferences in their favor, no reasonable jury could find that the Wilder Parties' purported breaches caused their damages. This is because the damages that WOB and Povetkin seek are attributable in this case to intervening causes — namely, Povetkin's positive test for Meldonium, the WBC's consequent postponement of the Bout, and/or the WBC's subsequent failure to reschedule or resanction the Bout.

29

We begin by noting that even the WOB Parties themselves assert that their damages flow from the fact that the Bout did not take place. WOB claims damages for the expenses it incurred "in reliance upon [the Wilder Parties'] promises to perform" under the Bout agreement — that is, to fight in the Bout. WOB Mem. at 33. Povetkin claims as damages the purse he would have won had the fight taken place. Id. at 34. Thus, the WOB Parties must show that the various breaches they assert by Wilder — announcing the bout had been canceled, not traveling to Moscow, fighting another boxer, and filing this action — were the proximate cause of these damages. We agree, as the WOB Parties argue, WOB Reply at 16-17, that their burden is to show that Wilder's breaches "'were a substantial factor in the sequence of responsible causation' and the 'injury was reasonably foreseeable or anticipated as a natural consequence.'" WOB Reply at 16-17 & n.11 (quoting Rothstein v. UBS AG, 708 F.3d 82, 91 (2d Cir. 2013)); accord Lerner v. Fleet Bank, N.A., 318 F.3d 113, 123 (2d Cir. 2003); Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P., 985 F.2d 102, 104 (2d Cir 1993); Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23-24 (2d Cir. 1990). In other words, we accept that the causation test does not require a breach to be the "sole cause" of a party's damages, but may be satisfied where a breach "would be thought of by people generally as having operated to an important extent in producing the harmful result." Coastal Power Int'l, Ltd. v. Transcon. Capital Corp., 10 F. Supp. 2d 345, 366 (S.D.N.Y. 1998) (emphasis in original) (internal quotation marks and citation omitted), aff'd, 182 F.3d 163 (2d Cir. 1999).

Here, no reasonable jury could find that Wilder's actions were a substantial factor in the causing Povetkin and WOB's damages. Rather the damages they allege all result from the fact that the Bout did not take place — and still has not taken place. The only immediate reason the Bout did not take place was that the WBC postponed it in response to Povetkin's test for a

banned substance.  Nothing in the record suggests that any act of Wilder's was a factor, let alone a substantial factor, in the WBC's decision.

At various points, the WOB Parties suggest that Wilder was the cause of the WBC's making its decision to postpone the Bout.  See, e.g., WOB Reply at 31 ("[A] jury could reasonably draw the [] inference . . . that Mr. Wilder's decision not to board his flight to Moscow left the WBC with 'little choice'" but to postpone the Bout) (quoting ESPN Postponement Article).  We accept the proposition, see id. at 17, that the proximate cause test may still be met even when "acts of a third person intervene between the defendant's conduct and the plaintiff's injury," provided that "the intervening act is a normal or foreseeable consequence of the situation created by the defendant's [actions]." Deridiarian v. Felix Contracting Corp., 51 N.Y.2d 308, 315 (1980).  But there is simply no evidence that the WBC's postponement decision was a "normal or foreseeable consequence" of Wilder's actions, or that Wilder's acts otherwise caused the WBC's decision.

One powerful — if not dispositive — piece of contrary evidence comes from the WBC itself.  The WBC unequivocally stated that Povetkin's positive drug test was the reason for the WBC postponing the Bout.  See, e.g., Postponement Press Release.  The WOB Parties offer no testimony from a representative of the WBC or anyone else that the reason given by the WBC was not the real reason.  While the WOB Parties argue that it was Wilder's failure to appear in Moscow, rather than Povetkin's positive test result, that caused the WBC to postpone the Bout, see WOB Reply at 31, no reasonable jury could indulge in the speculation that would be required to conclude that this was so (and that the WBC falsely stated the reason the fight was being postponed).  See Scotto, 143 F.3d at 114 ("The non-moving party may not rely on conclusory allegations or unsubstantiated speculation" to show that there is a genuine dispute of material

31

fact.) (citation omitted).[9]

The WOB Parties suggest that the Bout might have been rescheduled if not for Wilder's actions. WOB Reply at 31-32. However, there is no evidence that would allow a jury to conclude that the WBC's failure to reschedule the Bout was influenced by Wilder's purported breaches. The only evidence in the record even remotely supporting an inference that the WBC would have rescheduled the Bout at all is the WBC's ruling on August 17, 2016, stating that Povetkin was cleared to fight again and would compete against another boxer for the WBC Interim Heavyweight Championship while Wilder recovered from the injuries he suffered in the bout with Arreola. See Aug. 17 Ruling Regarding Heavyweight Division. However, the record simply does not support the additional inference that Wilder caused the WBC not to reschedule the Bout during that period. As an initial matter, in a ruling issued that same day, the WBC noted that it had "called the Bout off and reserved any further ruling until the ongoing investigation, inquiry and evaluation process [of Povetkin] concluded." Aug. 17 Ruling Regarding Povetkin at 5. As was true with respect to the initial postponement, there is no admissible evidence to suggest that the WBC was giving a false reason for "call[ing] the Bout off" and that one of Wilder's purported breaches was instead a substantial factor in the WBC's decision.

In sum, WOB and Povetkin were not injured by any of the purported breaches; they were injured only because the Bout did not take place. But the WOB Parties have failed to show that

---

[9]  While the WOB Parties cite to such speculation contained in a newspaper article, see WOB Reply at 31 (citing ESPN Postponement Article), they fail to explain why the article, which is unsworn, is admissible, see Ladner v. City of New York, 20 F. Supp. 2d 509, 519 (E.D.N.Y. 1998) (noting that a newspaper article constituted "inadmissible hearsary" that was "unusable to defeat summary judgment."), aff'd, 181 F.3d 83 (2d Cir. 1999).

the Wilder Parties' purported breaches proximately caused the Bout not to take place. To the contrary, even drawing all reasonable inferences in the WOB Parties' favor, a jury would be compelled to find that the Bout did not go forward because of Povetkin's positive drug test and the WBC's ensuing decisions in response to that positive test. Because a reasonable jury could not find that any breach by the Wilder Parties proximately caused the WOB Parties' damages, the Wilder Parties' motion for summary judgment dismissing the WOB Parties' claim for breach of the Bout Agreement is granted.

B. Breach of the Implied Covenant of Good Faith and Fair Dealing

The WOB Parties briefly argue that the Wilder Parties breached the implied covenant of good faith and fair dealing by undertaking "a series of actions designed to take opportunistic advantage of Mr. Povetkin's positive test in order to obtain Mr. Wilder's share of the purse from WOB without actually having to participate in the Bout." WOB Mem. at 40. WOB argues that there was a breach of the implied covenant and good faith both with respect to the Bout Agreement and the Escrow Agreement, id. at 40-43, even though their Amended Answer makes this counterclaim only with respect to the Bout Agreement, Am. Answer at Counterclaims ¶¶ 98-101. We limit our discussion here to the Bout Agreement. We discuss the Escrow Agreement in the next section.

Under New York law, "a covenant of good faith and fair dealing in the course of contract performance" is "[i]mplicit in all contracts." Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (1995) (citation omitted). The implied covenant of good faith and fair dealing obligates a promisor to fulfill "any promises which a reasonable person in the position of the promisee would be justified in understanding were included" in the contract. Id. (internal quotation marks omitted) (quoting Rowe v. Great Atl. & Pac. Tea Co., 46 N.Y.2d 62, 69 (1978)). "The elements

of a claim of breach of the implied covenant are similar to causes of action for breaches of duties

of care, in that it requires the existence of a duty, breach of that duty, causation, and damages."

Hadami, S.A. v. Xerox Corp., 272 F. Supp. 3d 587, 598 (S.D.N.Y. 2017) (citation omitted).

Thus, the WOB Parties here must show that the breach of the duty of good faith and fair dealing

"proximately cause[d] [their] damages." Washington v. Kellwood Co., 2009 WL 855652, at *6

(S.D.N.Y. Mar. 24, 2009) (citation omitted); accord Schonfeld v. Wells Fargo Bank, N.A. as Tr.

for Aegis Asset Backed Sec. Tr. Mortg. Pass-Through Certificates, Series 2004-3, 2017 WL

4326057, at *5 (N.D.N.Y. Sept. 27, 2017).

> The WOB Parties allege that
>
> Mr. Wilder's refusal to show up in Moscow as scheduled, . . . defendant's press
> campaign calling Mr. Povetkin a cheat and a liar, Mr. Wilder's demands to 'get me my
> money,' his disregard of his own contractual obligations by engaging in a 'stay-busy'
> bout, and Plaintiffs' threats to the WBC both during its investigation and after its August
> 2016 Ruling — constituted a campaign to exploit Mr. Povetkin's Meldonium result to
> extract their contractual compensation without performance.

WOB Mem. at 42. Similarly, the WOB Parties argue that despite the fact that the Wilder Parties

"understood or should have understood that the Meldonium test results required investigation

and expert analysis," they nevertheless "immediately made defamatory press statements and

attempted in other ways to force the WBC's hand . . . ." Id. The WOB Parties allege that these

actions deprived them of the fruits under the Bout Agreement, which were "the staging of and

participation in the Bout." Id. at 43.

> This argument fails for the reason just discussed. Even if this conduct constituted a

breach of the implied covenant of good faith and fair dealing inhering in the Bout Agreement,

nothing in the record supports the inference that the Bout was postponed or canceled due to any

action performed by the Wilder Parties. To the contrary, a reasonable jury could find only that

the Bout's non-occurrence was due to Povetkin's positive test for Meldonium and the WBC's resulting postponement of the Bout. Because the postponement of the Bout was not proximately caused by the alleged actions of the Wilder Parties, and the postponement of the Bout was the sole cause of the WOB Parties' damages, the Wilder Parties' motion for summary judgment dismissing this claim is granted.

### C. Escrow Agreement

#### 1. Entitlement to the Funds Held in Escrow

The Wilder Parties seek a declaratory judgment that they are entitled to the funds held in escrow pursuant to the Escrow Agreement. See Compl. ¶¶ 63-69; Wilder Mem. at 30-32. The WOB Parties' counterclaims seek a judgment from this Court "[a]warding [WOB] the $4,369,365.00 in Escrow Property." See Am. Answer at Ad Damnum ¶ 2; see also WOB Reply at 23. Both parties now move for summary judgment in favor of their claims and in opposition to the claims against them. See Wilder Mem. at 30-32; WOB Mem. at 36-37.

Section 1.3(b) of the Escrow Agreement provides that CTC, the escrow agent, was to deliver the escrowed funds to Wilder upon Wilder's presentation of proof that the Bout took place on May 21, 2016. Section 1.3(c) of the Escrow Agreement states that CTC "shall disburse the entire Escrow property to WOB" if the Bout was "cancelled or postponed and did not or will not take place on May 21, 2016," upon presentation of certain proof by WOB. Section 1.3(d) of the Escrow Agreement states that if an objection to disbursement is made within two days after the escrow agent notifies the parties of a requested disbursement, then "the Escrow Agent shall not disburse any funds unless and until it receives joint instruction from the parties or a non-appealable order from a court of competent jurisdiction, at which time it shall disburse the funds to the parties as their interests may appear."

35

WOB is entitled to the funds held in the escrow account. Section 1.3(c) provides that the escrow agent was to pay out the entire escrowed funds upon presentation of an affidavit from WOB stating that the bout did not take place on May 21, 2016, and an article from a website called "www.fightnews.com" reporting that the Bout "did not . . . take place on May 21, 2016." While WOB did not present such an affidavit and article, it would have been a pointless act to have done so given that the Wilder Parties had already submitted an objection to disbursing the funds. See Strasbourger v. Leerburger, 233 N.Y. 55, 60 (1922) ("The law requires no one to do a vain thing."). There is no need to require WOB to tender the affidavit and article now given that (1) it is undisputed that the Bout did not take place on May 21, 2016; and (2) for the reasons described, in this Opinion and Order, Wilder does not have a claim to any of the escrowed funds. Thus, WOB is entitled to have the escrowed funds released.

While, as set forth more fully in the next section, we agree with the Wilder Parties that they could properly have objected to the release of the escrowed funds based on their claim that there had been a breach of the Bout Agreement, it is not necessary to reach this issue because we have found that neither side is entitled to any damages for breach of the Bout Agreement.

Accordingly, the WOB Parties' motion for summary judgment is granted in favor of the WOB Parties' claim that they are entitled to the funds held in escrow, and against the Wilder Parties' claim for a declaratory judgment stating that they are entitled to these funds. We are aware that the WOB Parties seek interest on the escrowed funds. WOB Mem. at 35-36, 40. But interest can result only from a judgment that is entered "against" the Wilder Parties. J. D'Addario & Co. v. Embassy Indus., Inc., 20 N.Y.3d 113, 118 (2012) ("where the losing [parties] were not guilty of any breach," no judgment is entered "against" those parties and the New York CPLR provision providing for interest in a breach of contract case is inapplicable.).

Because, for the reasons described in this Opinion and Order, we conclude that the Wilder Parties did not breach the Escrow Agreement or the Bout Agreement, no judgment is being entered "against" the Wilder Parties, and WOB's request for interest is denied.

### 2. Whether the WOB Parties are Entitled to $2.5 Million in Liquidated Damages

The WOB Parties seek summary judgment on their claim to $2.5 million in liquidated damages under the Escrow Agreement. See WOB Mem. at 37-40. The Wilder Parties cross-move for summary judgment on this claim. Wilder Mem. at 32-34.

As already discussed, the Escrow Agreement contains provisions under which Wilder was to notify the escrow agent to make escrow payments to him if the fight took place on May 21, 2016, and allowed WOB to notify the escrow agent to make a payment to it if the fight did not take place on May 21, 2016. See Escrow Agreement §§ 1.3(a)-(c). Section 1.3(d) of the Escrow Agreement instructs the escrow agent not to make these payments, however, if any party objects to the payment within two days of receiving a notification. Section 1.3(d) further provides that if a party submits "an objection in writing to the Escrow Agent which is not made in good faith . . . the party who has filed such objection agrees to pay liquidated damages to the party entitled to the disbursement in the amount of USD $2.5 million . . . ." The sole issue that needs to be decided is whether a reasonable jury could find that Wilder Parties, through their attorney John Wirt, did not make the objection to release of the escrowed funds in "good faith" within the meaning of Section 1.3(d).

In their briefing, the parties do not make arguments about the meaning of "good faith" in the Escrow Agreement. Wilder is silent on the subject. WOB makes reference to case law regarding the implied covenant of good faith and fair dealing, see WOB Mem. at 39; WOB Reply at 24 n.15, 28. While WOB never asserted in its counterclaims that it was making a claim

based on an implied covenant of good faith as opposed to the express covenant contained in Section 1.3(d), we will accept their implicit suggestion, which is unopposed, to apply this case law to the term "good faith" under Section 1.3(d).

Under case law dealing with the implied covenant of good faith, the Second Circuit has noted that whether a party acted in good faith "is governed by a subjective, rather than an objective standard." Leberman v. John Blair & Co., 880 F.2d 1555, 1560 (2d Cir. 1989). Nonetheless, we also accept, as defendants argue, see WOB Reply at 24 & n.15, that the objective reasonableness of a party's action may be considered in assessing whether a party was in fact acting in good faith. See, e.g., McCleavey v. Physicians Reciprocal Insurers, 232 A.D.2d 381, 382 (2d Dep't. 1996) (citing to "objective" evidence in deciding whether a party breached the implied covenant of good faith and fair dealing); see also Dalton, 87 N.Y.2d at 389 (noting that the covenant of good faith and fair dealing encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included.") (emphasis added) (internal quotation marks and citation omitted). To show that an alleged breaching party failed to act in good faith, the opposing party must show that the alleged breaching party "exercised a right malevolently, for its own gain as part of a purposeful scheme designed to deprive plaintiffs of the benefits" under the contract. Richbell Info. Servs., Inc. v. Jupiter Partners, L.P., 309 A.D.2d 288, 302 (1st Dep't 2003); accord 19 Recordings Ltd. v. Sony Music Entm't, 165 F. Supp. 3d 156, 161 (S.D.N.Y. 2016); Serdarevic v. Centex Homes, LLC, 760 F. Supp. 2d 322, 333 (S.D.N.Y. 2010).

Ordinarily, "[s]ummary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles." Leberman, 880 F.2d at 1560 (internal quotation marks and citations omitted); accord Krishna v.

Colgate Palmolive Co., 7 F.3d 11, 16 (2d Cir. 1993). However, if allegations of bad faith "amount to nothing more than speculation and conjecture, after ample opportunity to engage in relevant discovery, a summary judgment motion may be granted." First Nat'l Bank of Bos. v. Mfrs. Hanover Tr. Co., 1991 WL 125188, at *5 (S.D.N.Y. July 2, 1991); accord Barbara v. MarineMax, Inc., 577 F. App'x 49, 51 (2d Cir. 2014) (summary order) (affirming grant of summary judgment in favor of defendant where "[on] this record, taken as a whole, a rational trier of fact could not find that [defendant] acted in bad faith."); see also Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("The summary judgment rule would be rendered sterile [] if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion.").

As an initial matter, although WOB acknowledges that a lack of "subjective good faith" is an element of its claim against the Wilder Parties, WOB seemingly argues that the Wilder Parties failed to prove their subjective good faith. See WOB Reply at 24-26. Case law, however, holds that "the burden of proving a breach of the covenant of good faith and fair dealing is on the person asserting the absence of good faith." Tractebel Energy Mktg., Inc., 487 F.3d at 98 (internal quotation mark and citation omitted). While here there is an explicit rather than implied covenant of good faith, the rule is the same because, as the party claiming that the Wilder Parties breached the Escrow Agreement, WOB has the burden of proving its claim. See, e.g., Raymond v. Marks, 116 F.3d 466, 466 (2d Cir. 1997) ("Under New York law, the party asserting a breach of contract claim has the burden of proving the material allegations in the complaint by a fair preponderance of the evidence.") (citation omitted).

In support of its argument that the Wilder Parties did not act in good faith, WOB points to no subjective evidence of their conduct. Instead it asserts that this Court must "look to 'the

relationship of [the] parties as structured by the contract.'" WOB Mem. at 39 (quoting

Travellers Int'l., 41 F.3d at 1575) (alteration in original). The WOB Parties argue that the

Escrow Agreement clearly provided WOB with the right to obtain the escrowed funds where, as

here, the Bout was canceled or postponed. See WOB Mem. at 39-40 ("Here, Mr. Wilder's

objection was not reasonably made within the boundaries 'structured by the contract' because

the objection did not and could not contend that the Bout actually occurred, and it is

unreasonable to read the Escrow Agreement authorizing the parties to freeze the escrow account

pending resolution of a dispute over why the Bout was postponed.") (emphasis in original).

Accordingly, the WOB Parties argue that the Wilder Parties could not have reasonably believed

that WOB was not entitled to the escrowed funds, and thus the Wilder Parties' objection was in

bad faith. See id.

We begin by noting that there were certainly non-frivolous arguments that Povetkin had

breached the Bout Agreement when he tested positive for Meldonium — at a minimum based on

the potentially ambiguous statement in the WBC's rules that a fighter "should not" ingest a

performance-enhancing substance. The Wilder Parties thus could reasonably have believed that

they had a claim to damages for their expected payment under the Bout Agreement — the very

funds that were held pursuant to the Escrow Agreement. As for whether the Escrow Agreement

could reasonably be interpreted to allow an objection in these circumstances, we note that the

Escrow Agreement is silent as to the bases on which the parties could object to the disbursement

of the escrowed funds. The Escrow Agreement could have placed conditions or restrictions on

objections but it did not do so. Instead, it places no limitations on the exercise of that right other

than to penalize an objection that is not made in "good faith."

In light of the almost unfettered authority accorded each side to object to the

disbursement of escrowed funds, and because the only purpose of the Escrow Agreement was to ensure payment to Wilder of the money he was due under the Bout Agreement, it was objectively reasonable for the Wilder Parties to conclude that they could make an objection in order to preserve the very monies they would be awarded for a successful claim under the Bout Agreement.  In light of the objective reasonableness of this view, a reasonable jury could not conclude that the Wilder Parties "exercised a right malevolently."  Richbell Info. Servs., Inc., 309 A.D.2d at 302.

Moreover, the WOB Parties have pointed to no subjective evidence showing "malevolent" intent on the part of the Wilder Parties.  Indeed, while it is not necessary to consider it, at least some evidence in the record indicates that the Wilder Parties believed at the time that they were validly exercising their contractual rights.  For example, DiBella averred in a declaration that his "understanding and reading of the plain language of [Section 1.3(d) of the Escrow Agreement] was (and is) that its sole purpose was to give the parties the unfettered right to ensure that the Escrow Property remained secure while they either reached an agreement about its distribution, or were able to litigate competing claims to their final conclusion." Declaration of Lou DiBella, dated Nov. 13, 2017 (annexed as Ex. 17 to Schalk Decl.), at ¶ 11. Both Finkel and Dombroff allege that they recalled this conversation and stated that DiBella's description of it was accurate.  See Dombroff Decl. ¶ 4; Finkel Decl. ¶ 4.[10]

The WOB Parties point to the fact that although this Court "provided Mr. Wilder with an

_____

[10]  The WOB Parties argue, see WOB Reply at 26-28, that Dombroff's and DiBella's declarations should be disregarded because they are conclusory, fail to adequately allege the sources of the declarants' knowledge, and conflict with the declarants' deposition testimonies. We need not reach these issues because even assuming the inadmissibility of these affidavits, summary judgment would still be warranted as to this claim based on the lack of any evidence in the record indicating that the Wilder Parties did not act in good faith.

opportunity to prove that he acted in good faith under the advice of counsel . . . . Mr. Wilder did

not do so" in that he failed to introduce evidence showing that he acted in reliance on advice of

counsel in making the objection.  WOB Mem. at 38.  This argument, however, ignores the point

that, as the Court previously held, "[a]n argument that Wilder acted in good faith could be made

without testimony of counsel if it was reasonable (even if erroneous) to interpret the contract to

allow Wilder to make an objection to disbursement based on his claim to payment under the

Bout Agreement."  Wilder v. World of Boxing LLC, 220 F. Supp. 3d 473, 482 n.4 (S.D.N.Y.

2016).  Thus, Wilder was not obligated to present an advice of counsel defense to establish his

good faith.

The WOB Parties also urge a narrower interpretation of the right to object under Section

1.3(d) on the ground that the agreement sets forth no basis for the payment of interest.  See

WOB Mem. at 39.  The WOB Parties argue that allowing an objection to be lodged "at will for

some reason not mentioned in the Escrow Agreement," would have the effect of giving "one

party an unfair and unreasonable advantage over the other, or [] would place one party at the

mercy of the other," id. (internal quotation marks and citations omitted), a result that New York

law cautions should avoided in construing a contract, Luver Plumbing & Heating, Inc. v. Mo's

Plumbing & Heating, 144 A.D.3d 587, 588-89 (1st Dep't 2016).  However, to say that Section

1.3(d) permits parties to object "at will" is misleading, inasmuch as this provision requires

objections to be made in good faith.  Further, not awarding interest while parties dispute in good

faith a payment under an escrow agreement cannot be construed as an "unreasonable" advantage.

Had one party objected in bad faith, then a significant penalty was due under the contract.  The

contract language cannot be reinterpreted simply on the basis that it could not have been the

intent of the contracting parties that they would forgo interest for the time period it took to reach

an agreement or to obtain a court order as to disbursement of the funds.

In sum, a reasonable jury could not find that the Wilder Parties, simply by objecting to the release of escrowed funds at the time they learned Povetkin had tested positive for Meldonium, did not act in good faith. Accordingly, the Wilder Parties' motion for summary judgment in support of their argument that they are not liable for $2.5 million in liquidated damages is granted, and WOB's motion for summary judgment on its claim that it is entitled to these liquidated damages is denied.

## V. CONCLUSION

For the reasons set forth above, the Wilder Parties' motion (Docket # 284) and the WOB Parties' motion (Docket # 296) are each granted in part and denied in part. All claims in the two actions are dismissed with the exception of the defamation claim, which has been stayed. We further find that WOB is entitled to an order directing the escrow agent to disburse to it all of the escrowed funds.

SO ORDERED

Dated: April 19, 2018
    New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge